Filed 4/1/14  P. v. Torres CA22/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>ANDRE A. TORRES,<br><br>　　　Defendant and Appellant. | B240978<br><br>(Los Angeles County<br>Super. Ct. No. BA371673) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Edmund Willcox Clarke, Judge.  Affirmed.

Lynette Gladd Moore, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Andre Torres[1] appeals from a judgment entered after a jury found him guilty of willful, deliberate and premeditated attempted murder, and found true the special allegations that he used a deadly and dangerous weapon and inflicted great bodily injury in the commission of the attempted murder. The trial court sentenced Torres to a term of life plus four years.

Torres contends the trial court erred in not holding a *Marsden*[2] hearing based on comments Torres made to the court while the jury was deliberating. Torres did not expressly request a *Marsden* hearing or ask to substitute counsel at that time, as he had done during prior proceedings which are not at issue on appeal. Torres also contends the trial court erred in declining his request to represent himself (*Faretta* motion),[3] which he made after the jury reached its verdict. The court found Torres was not mentally competent to represent himself. We affirm.

## BACKGROUND

**Prosecution Case**

On May 20, 2010, Torres stabbed victim Joseph Rippinger in the back with a butcher knife at the Junipero Serra State Building (State Building) in a courtroom used for hearings before the Workers' Compensation Appeals Board. Rippinger, an attorney with the law firm Graves and Bourassa, was at the State Building that day to participate in a large event held in the first floor auditorium to settle liens in workers' compensation

---

[1] Before this case went to trial, Torres requested that the trial court and the attorneys use a female pronoun and form of address when referring to him because he is a transgender person who identifies as a woman. The court granted the request. The probation report identifies Torres as a man. The prosecution witnesses who testified at trial stated they believed Torres was a man and was presenting himself as a man when they saw him on the date of the offense. On appeal, Torres's counsel and the Attorney General use male pronouns when referring to him. In this opinion we also will use male pronouns when referring to Torres. We do this for consistency and not out of disrespect for Torres.

[2] *People v. Marsden* (1970) 2 Cal.3d 118.

[3] *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

2

cases.  Torres arrived at the State Building in the early afternoon on May 20, 2010.  He told the security guard he was going to the ninth floor, where the Workers' Compensation Appeals Board offices and courtrooms were located, to get some paperwork for his case.  At some point after arriving on the ninth floor, Torres went inside the courtroom of Judge George Reny and sat down.  The courtroom was dark that day because Judge Reny was spending the day in the auditorium on the first floor, assisting parties in settling liens.

Torres had been trying to set aside an October 2008 settlement in a workers' compensation case he filed against his employer.  In September 2009, Torres represented himself at a hearing before Judge Reny, held in Judge Reny's ninth floor courtroom in the State Building.  The law firm Graves, Roberson and Bourassa [4] represented the insurance company that was adverse to Torres in the workers' compensation case.  Judge Reny ruled against Torres, finding Torres had not demonstrated good cause to set aside the settlement.  In November 2009, Torres filed an unsuccessful petition for reconsideration of Judge Reny's decision.  Torres also wrote a letter to the presiding judge of the Workers' Compensation Appeals Board, Jorja Frank, complaining about Judge Reny.

In the afternoon on May 20, 2010, Rippinger negotiated a settlement in one of his cases and needed to get client approval.  He looked for a more private location where he could call his client on the ninth floor where he had been using a waiting room for his settlement meeting.  He peered in the window of Judge Reny's courtroom and saw Torres sitting inside.  Torres was wearing khaki shorts, a windbreaker jacket over a shirt, and running shoes.  Rippinger had never seen Torres before and did not believe he was an attorney or a lien claimant, so Rippinger went inside the courtroom to make his telephone call.  Rippinger placed his files on the empty table in the courtroom, sat down at the opposite end of the table from Torres, opened a file, and made his call.  Rippinger identified himself to the person who answered as "Joe Rippinger with Graves and Bourassa."

---

[4] This law firm later changed its name to Graves and Bourassa.  Rippinger was not involved in Torres's workers' compensation case.

As the person on the other end was transferring Rippinger's call, Rippinger felt what he believed was a punch in the middle of his back. Rippinger turned around and saw Torres standing over him with a "kitchen butcher knife" in his hand. Rippinger picked up a chair, lifted it over his head and struck Torres with it. Torres dropped the knife. Rippinger then used the chair to push Torres into another chair, holding Torres in place. Rippinger screamed for help.

Daniel Perugini, another attorney who was participating in the large settlement event, heard Rippinger scream and went to Judge Reny's courtroom. Rippinger told Perugini that Torres had stabbed him. Perugini suggested Rippinger sit down. Perugini took the chair from Rippinger and continued to hold Torres in place. Perugini noticed the knife on the floor.

Officer Aaron Mark Braaksma, from the California Highway Patrol, responded to Judge Reny's courtroom. He saw that Rippinger was bleeding from his back and appeared to be in pain. Rippinger told Braaksma that Torres had stabbed him, he did not know Torres, and he did not know why Torres had stabbed him. Braaksma observed "a large steel-bladed kitchen knife with a black handle" on the floor near Torres. Braaksma handcuffed and searched Torres. From inside Torres's jacket, Braaksma recovered "a cardboard sheath that had been taped together." Braaksma retrieved the knife and placed it inside a manila envelope. According to Braaksma, "the knife was so sharp it was actually cutting its way through the manila envelope."

After being transported to the hospital, Rippinger received six to eight staples in his back to close the stab wound. Tests indicated there was fluid around Rippinger's heart, so doctors performed a sternotomy during which they opened his chest and pericardial sack. Though doctors determined there was no actual injury to Rippinger's heart, there was a small amount of fluid around his heart which was abnormal, so the doctors placed a drain to remove the fluid and then closed his chest. Of the five days Rippinger spent in the hospital, three were in the intensive care unit. Following his release from the hospital, Rippinger developed an infection and returned to the hospital

4

for 10 days.  Another sternotomy was necessary to drain more fluid from his chest. Rippinger was out of work for about two months after the stabbing.[5]

**Defense Case**

Torres is the only witness who testified at trial for the defense.  He stated he is a transgender person who identifies as a woman, and he was presenting himself as a woman on May 20, 2010, as he had been for many years.[6]  On that day, he was wearing makeup and a woman's hairstyle, had shaven legs and "double D size breasts."

Torres went to the State Building on May 20, 2010 to obtain a transcript of the proceedings held before Judge Reny.  He denied that he brought a knife into the building. According to Torres, the cardboard item Officer Braaksma recovered was not a sheath, but a package for a bracelet he was going to get repaired that day.  The package was in his shorts—not his jacket as Officer Braaksma had claimed—and the bracelet was inside the package.

Torres testified that he went into Judge Reny's courtroom to use the telephone to contact Judge Frank or a member of her staff.  He had been told that Judge Frank would have to approve his request for the transcript before he could obtain it.  Torres stated that when he entered the courtroom he noticed that the table was covered with two pizza boxes, a pitcher of punch, and a tray containing bread crumbs and the knife that was shown to the jury.[7]  Torres used the telephone, but was unable to reach Judge Frank or a member of her staff.

Rippinger entered the courtroom while Torres was making his telephone call. Torres did not hear Rippinger say the name of his law firm.  Rippinger sat down next to

---

[5] Officer Braaksma, Daniel Perugini, Joseph Rippinger, Judge Reny, a security guard who was working at the State Building on May 20, 2010, and a doctor who treated Rippinger during his first stay at the hospital testified for the prosecution.

[6] Judge Reny testified that Torres presented himself as a male during the workers' compensation case.

[7] The prosecution witnesses who were in the courtroom that day denied seeing any of these items on the table.

Torres, who was standing, and ran his hand along Torres's leg. According to Torres, Rippinger said, "'nice legs mamacita.'" Torres described Rippinger as having had a "happy stupid look in [*sic*] his face," and an odor of alcohol emanating from him. Torres gave Rippinger "a mean look."

Torres testified that Rippinger then stood up, facing Torres, and grabbed Torres around the waist. Rippinger rubbed himself against Torres and said, "'You have two nice big chiches, mamacita. Do you speak English?'" Torres understood Rippinger to mean he had nice breasts. Rippinger then asked Torres in Spanish if Torres spoke English. Torres told Rippinger to get away from him. Torres struggled against Rippinger, but Rippinger's arms were "locked" around Torres.

Torres stated that he moved his hand around the table and grabbed the knife with his fingertips, but did not have a good grip on the knife and was only able to "prick[]" Rippinger in the back, making only "a very superficial cut." Rippinger released Torres and Torres dropped the knife. Then Rippinger threw a chair at Torres and blocked Torres from exiting the courtroom. Torres screamed for help. Perugini entered the courtroom and helped Rippinger restrain Torres.

According to Torres, after he was placed in the custody of the California Highway Patrol, Judge Frank and another woman approached him with a video camera and told him to say he went to the State Building that day to kill someone because he was angry about his workers' compensation case. Torres declined.

We do not summarize all of Torres's testimony, including his testimony about his workers' compensation case, because it is not necessary for our resolution of the issues on appeal.

**Verdict and Sentence**

The jury found Torres guilty of willful, deliberate and premeditated attempted murder (Pen. Code, §§ 187, subd. (a) & 664), and found true the special allegations that he used a deadly and dangerous weapon (Pen. Code, § 12022, subd. (b)(1)), and inflicted great bodily injury in the commission of the attempted murder (Pen. Code, § 12022.7, subd. (a)). The trial court sentenced Torres to a life term for the attempted murder, plus

6

one year for the weapon enhancement and three years for the great bodily injury enhancement, for a total sentence of life plus four years in prison.

## DISCUSSION

On appeal, Torres contends he was entitled to a *Marsden* hearing, outside the presence of the prosecutor, based on comments he made to the trial court on February 10 and 14, 2012, while the jury was deliberating. These comments are set forth below. He also contends the trial court erred in denying his requests to represent himself at sentencing and for purposes of filing a new trial motion. The court sentenced Torres on March 2, 2012. We discuss below proceedings in this matter dating all the way back to August 2010, because these proceedings are related to the *Faretta* and *Marsden* issues Torres raises on appeal.

### Proceedings Related to *Faretta* and *Marsden* Issues

On August 10, 2010, about one and one-half years prior to trial, Torres moved to represent himself, and his counsel declared a doubt as to his competence. The trial court suspended case proceedings and set a hearing under Penal Code section 1368. Two medical doctors evaluated Torres.

Dr. Jack Rothberg found Torres incompetent to stand trial, stating in his August 25, 2010 report, in pertinent part: "It became more and more obvious as the interview proceeded that Mr. Torres is clearly suffering from a major mental illness, most likely paranoid schizophrenia. He is highly delusional about the proceedings and, more importantly, it would be impossible for him to cooperate with counsel in a rational manner. He simply cannot exercise any type of judgment or reasoning. His thinking is colored by paranoid thinking, and he makes statements that are so illogical yet expects them to be accepted by a judge or jury in court. I do not believe he is competent to stand trial. He requires aggressive treatment with anti-psychotic medication which he is unlikely to accept on a voluntary basis. He should be remanded to Patton State Hospital for aggressive treatment. In addition, he is even less capable of representing himself pro per which is a somewhat higher standard than even being competent to be represented by counsel."

7

Dr. Kaushal Sharma found Torres "may be suffering from a mental illness; however, at this time he is competent to stand trial." Dr. Sharma stated in his September 9, 2010 report, in pertinent part: "I do not believe Mr. Torres is an individual who is competent to be in pro per. However, his understanding of the present charges and his seemingly rational cooperation with me leads me to believe that he would be competent with the assistance of any attorney."

The trial court reviewed the two reports, and on September 13, 2010, appointed a third doctor to evaluate Torres. Dr. Kory Knapke stated in his October 19, 2010 report, in pertinent part: "I believe that the defendant is marginally incompetent to stand trial at this time. The defendant does understand the charge against him and appears to have a rudimentary understanding of courtroom proceedings. However, he still remains suspicious of his public defender and still believes that she may have been plotting against him with the district attorney in his case. He continues to harbor similar suspiciousness even though it may have decreased since Dr. Rothberg's examination. He continues to harbor paranoia concerning others. [¶] . . . [¶] At the time of this clinical interview when I attempted to question him about some of the circumstances regarding this instant offense, he had very bizarre and inappropriate affect, frequently smiling when discussing the instant offense and his explanation was very unusual. Because of his mild to moderate difficulty rationally cooperating with me during this interview, I do not believe he can rationally cooperate with his attorney or his court proceedings at this time. However, I believe his lack of competency is marginal at this time, and I believe he will be quickly restored to competency in the state hospital system." According to Knapke's report, Torres had "changed his mind" and had "no intention of going pro per at th[at] point."

On November 15, 2010, after reviewing and considering the three reports, the trial court adjourned the criminal proceedings, finding Torres was not mentally competent to stand trial, and ordered the State Department of Mental Health to place Torres in a mental hospital. Torres was placed in Patton State Hospital. On February 18, 2011, the trial

8

court reinstated the criminal proceedings based on the State Department of Mental Health's determination that Torres had "been restored to competency."

On March 3, 2011, about 11 months before trial, Torres moved to represent himself, and the trial court appointed Dr. Kaushal Sharma to evaluate whether Torres was competent to do so. In his report, dated April 4, 2011, Dr. Sharma concluded Torres was "not competent to act in pro per." Dr. Sharma explained, in pertinent part: "The defendant makes unreasonable interpretation of the facts, makes irrational demand for presenting peculiar defenses which are very unlikely to be allowed and believes that by asking to be his own attorney he will be able to succeed in the case without any doubt. I believe the defendant's irrational thinking prevents him from being able to rationally present a defense without an attorney. Thus, I believe the defendant even though competent to assist an attorney is incompetent to represent himself."

On May 2, 2011, while his motion to represent himself was pending, Torres made a *Marsden* motion, which the trial court continued to the next day. On May 3, 2011, the court heard oral argument on Torres's *Faretta* motion to represent himself. The court stated it believed it was required under existing California law to grant Torres's motion to

represent himself because he had been found competent to stand trial.[8] Torres's counsel urged the court to find Torres incompetent to represent himself based on a report from Patton State Hospital indicating Torres had "oppositional disorder" and was not discharged with "a clean bill of health." The court tentatively granted Torres's motion to represent himself pending his completion of the "Advisement and Waiver of Right to Counsel (*Faretta* Waiver)" form.

At the next hearing on May 23, 2011, Torres completed the *Faretta* Waiver form. As the trial court reviewed the form with Torres, the court asked Torres to stop smiling while the court reviewed the charge against him, explaining this is "a very serious case." The court asked Torres if he wanted to ask his counsel any questions before the court ruled on his motion to represent himself, and Torres responded, "I still want a hearing in the future," presumably referring to his pending *Marsden* motion. The court explained to Torres, "if I grant this motion, she's [defense counsel] gone." Torres indicated he understood. Defense counsel and the court made Torres aware that his access to the law library and other things he might need to represent himself could be restricted "for security reasons" due to his custody status as "a special handle." Torres said he

<hr/>

[8] In *Indiana v. Edwards* (2008) 554 U.S. 164, 174, 178, the United States Supreme Court concluded a so-called "gray-area defendant[]" may be competent to stand trial under *Dusky v. U.S.* (1960) 362 U.S. 402, but may be incompetent to conduct trial proceedings by himself due to "severe mental illness." The Court held that states may, but need not, limit a defendant's right to self-representation and insist the defendant be represented by counsel at trial "on the ground that the defendant lacks the mental capacity to conduct his trial defense unless represented." (554 U.S. at p. 174.) At the time of the May 3, 2011 hearing on Torres's motion to represent himself, the issue of whether California would accept the United States Supreme Court's "invitation and apply a higher standard of mental competence for self-representation than for competency to stand trial" was under review in the California Supreme Court in *People v. Johnson* (2012) 53 Cal.4th 519, 523. On January 30, 2012, more than eight months after the hearing on Torres's motion to represent himself and a few days before Torres's case went to trial, the California Supreme Court concluded "the standard that trial courts considering exercising their discretion to deny self-representation should apply is simply whether the defendant suffers from a severe mental illness to the point where he or she cannot carry out the basic tasks needed to present the defense without the help of counsel." (*Id*. at p. 530.)

understood. The court told Torres his decision to represent himself was "an ill-advised move," but the court granted Torres pro. per. status and relieved his counsel. At a hearing on July 18, 2011, the trial court appointed a different attorney, John Rodriguez, to act as standby counsel as Torres represented himself.

On November 15, 2011, Torres filed a motion to dismiss his case in the interest of justice under Penal Code section 1385 on grounds the Los Angeles County Sheriff's Department was violating his rights to equal protection and due process. On December 2, 2011, the trial court heard oral argument on the motion. Torres explained to the court that his motion was based on the denial of access to the law library and telephone. The court informed Torres it had documentation from the jail stating Torres had gone to the law library at least 10 times between October 2 and November 28, 2011, and there were occasions prior to that time when Torres himself had "refused" law library access. The court also stated that phone records showed Torres had had telephone access "recently." The court noted that it was aware of "problems" between Torres and deputies, including allegations that Torres had threatened to "gas an officer."[9] The court denied Torres's motion to dismiss.

At a hearing on January 4, 2012, the trial court decided to appoint advisory counsel for Torres; thus, the court changed Mr. Rodriguez's role from standby counsel to advisory counsel. At a hearing on January 10, 2012, the court made a finding that the parties were ready for trial. On January 19, 2012, the court issued a minute order indicating the parties had announced they were ready for trial during a hearing held that day.

---

[9] The Penal Code defines "'gassing'" as "intentionally placing or throwing, or causing to be placed or thrown, upon the person of another, any human excrement or other bodily fluids or bodily substances or any mixture containing human excrement or other bodily fluids or bodily substances that results in actual contact with the person's skin or membranes." (§ 243.9, subd. (b).) On January 24, 2012, during the pendency of this case, Torres was charged in a separate case with two felony counts of gassing.

11

On January 30, 2012, the matter was assigned to a courtroom for trial (Judge Edmund Willcox Clarke). Torres informed the trial court he was not ready for trial. He stated: "I didn't really have as much access as I should have to the law library. Because I was K-10 [custody status] the same day that I was -- that I became pro per, I was given almost no access to the law library. No access to the phone." Torres told the court he was "going to have to give up [his] pro per status" because of his lack of access to the things he needed to prepare his case. He requested the court appoint a female attorney to represent him, stating he felt "more comfortable talking about personal issues with a female" and had had "a better result" in the past when he was represented by a female attorney at trial than when he was represented by a male attorney at trial. He informed the court he did not want the female attorney who had represented him at the beginning of this case reappointed because he "didn't get along" with her. The court appointed Mr. Rodriguez (former advisory counsel in this case) to represent Torres at trial and explained to Torres that he did not have the right to choose the particular attorney or the gender of the attorney the court would appoint.

At the same hearing, defense counsel objected that Torres was "tethered" to the chair. The trial court stated for the record that Torres was wearing "a stealth belt," which was "designed to not be visible to the jury, or to others in the courtroom." The court explained that use of the device, coupled with the presence of two bailiffs in the courtroom, had been deemed necessary based on 20 reports of Torres's inappropriate behavior in custody, including gassing attempts and spitting.

On February 2, 2012, during a hearing outside the presence of the prospective jurors, Torres stated: "I want to ask for a Marsden hearing." Torres made this statement after he corrected defense counsel a few times for using male pronouns when referring to him. The court told Torres it did not believe defense counsel had meant to offend him, but rather had made a mistake in using male pronouns after the parties and the court had agreed to use female pronouns when referring to Torres. Torres stated in open court that he believed defense counsel was not ready for trial. He also complained that defense

12

counsel had not "hired any experts to look at the medical evidence." The court told Torres it would address his complaints the following day.

On February 3, 2012, Torres again informed the court he was "making a *Marsden* motion." After asking the prosecutor to leave the courtroom, the trial court held a *Marsden* hearing, listened to Torres's complaints about his attorney, and denied the motion.

Throughout the trial, there were several occasions in and out of the jury's presence when defense counsel Rodriguez used male pronouns when referring to Torres. Torres repeatedly complained about this, outside the jury's presence, and told the trial court he believed defense counsel was purposely doing it.

In front of the jury, Torres addressed witnesses directly even though he was represented by counsel. When Daniel Perugini was testifying on direct examination about what he said to Torres while restraining him, Torres said, "Did you see me doing something?" Torres's counsel told him to "[s]ettle down." After Joseph Rippinger testified on direct examination that he told Perugini, "that son of a bitch stabbed me in the back" (referring to Torres), Torres stated, "[t]hat's because you put your hands on me, bitch." The trial court immediately took a recess and admonished Torres about his "inappropriate" "comments or questions to the witness." Torres interrupted the court, stating, "I was sexually assaulted. How do you expect me to react?" The court further admonished Torres about interrupting the court. The previous court day, the court had warned Torres that if he continued to interrupt the court, he could be excluded from the proceedings.

After the prosecution rested and it was time for Torres to testify in his case, Torres told the trial court he had the flu and had "tried to refuse court today" because he was sick. The court made an inquiry to the jail and determined Torres had not complained about his health during the past few days. Torres took the stand. During his direct examination, Torres stated: "Mr. Rodriguez didn't have enough time to talk to me to even know what happened, so I don't see how he can be asking me questions. I mean, he's completely misguided." Direct examination continued.

13

When court resumed the following day, Torres told the trial court: "I'm not gonna take the stand until I talk to my attorney. I have a constitutional right to confer with my attorney, and I'm going to demand it be respected. This attorney has only been handling my case for a very little time. And I said it before, he's not prepared to handle my case." The court told Torres it would give him "a minute" to talk with his counsel. While the court was waiting for Torres to confer with his counsel, Torres said: "I wanted to address an issue. There are people sitting in the audience that were laughing at my testimony yesterday. [¶] . . . [¶] Specifically that bitch with blond hair that is sitting there." Defense counsel told the court he recognized the woman as someone from the district attorney's office. Defense counsel and the court stated they had not seen the woman do anything inappropriate. The court told Torres it would monitor the situation. Torres stated: "I see something like that again, I don't want to have an outburst when I'm on the stand, because I'm not gonna put up with that. [¶] . . . [¶] That happened at the last trial. I'm not gonna let it happen to this trial. This is important for me."[10]

During a conference on jury instructions on February 9, 2012, the day after Torres's testimony concluded, Torres made a motion to represent himself. While defense counsel was arguing in favor of instructions on attempted voluntary manslaughter, Torres interrupted and stated: "I want to invoke my Sixth Amendment right to represent myself under Faretta versus California, because I do not agree with any of this. And this is just ridiculous that, you know, this man -- I asked him to get [sic] try to get experts before he announces ready for trial and he didn't. Clearly Mr. Rippinger's life, as a result of the cut that he had on his back, was never in any danger. I don't have a perfect medical background, but I do have some. He could have just been put in observation. There were a number of thing[s] that could have been done."

The trial court responded: "[Y]our lawyer's articulating an argument regarding the jury instruction right now. You do not have a right to switch back and forth between

---

[10] It is not clear from the record what case Torres was referring to when he mentioned "the last trial."

representing yourself and a lawyer at any time that you choose. At this point your case is about to go to the jury. It's within my discretion, when a case is in trial, to avoid the disruptions that can occur from changing counsel. And for that reason, I'm going to deny your request to represent yourself at this point."

Defense counsel immediately requested a recess to speak with Torres. After commenting about Torres's repeated delay tactics, including having to be "extracted" from his cell the day before, the trial court reluctantly granted the recess. When the proceedings resumed, defense counsel told the court he was ready to proceed. Torres stated: "Can I make one statement? I want to reinvoke again my Sixth Amendment right to represent myself under Faretta versus California. The reason I did, my case was -- is not being done according to my wishes. There were no experts and many of the other things that I wish would have been done. All the evidence belonging to the prosecution has been made up against me, especially calling this attempted murder. When I have seen cases --" Torres told the court he would like to conduct his own "closing statement" with a new advisory counsel (not Mr. Rodriguez) to assist him with "court procedure."

The trial court responded: "I'm going to deny your request, because it would be unduly disruptive of the trial. And also under the case of Indiana versus Edwards, having read the doctor's reports about you long-existent in this file, and an opinion recently adopted, at least the principles of that, by our Supreme Court in California [*People v. Johnson*, *supra*]. I'm going to find -- [¶] . . . [¶] . . . that it's within my discretion, because of the possible issues of your mental health and ability to manage and understand the processes of the court, that you not be allowed to represent yourself. So for those two reasons you're being denied your request." The conference on jury instructions resumed.

During the defense closing, while counsel was arguing that the wound on Mr. Rippinger's back did not evidence an intent to kill, Torres interrupted and said, "It's only one inch." During the prosecutor's closing argument, after she acknowledged it was not possible based on the evidence presented at trial to determine exactly how deep the knife went into Mr. Rippinger's back, Torres interrupted and said, "It was an inch deep." As the trial court began to address Torres, he interrupted again and said, "I have the

15

paramedic report right here." In front of the jury, the court told Torres, "you don't want to be taken out of the room, of course, so please remain quietly and respectfully."

After the case had been submitted to the jury and the trial court was about to adjourn the proceedings for the day on February 9, 2012, Torres told the court he did not believe the psychiatric evaluations in the file were relevant because they were "so old." The court reiterated its reasons for denying Torres's *Faretta* motion—the timing of the motion and Torres's mental health issues—and cited its reliance on the information in the psychiatric reports. The court "noted" Torres's "concerns about the age of those records."

At the outset of the proceedings on February 10, 2012, while the parties and the court were discussing a potential error in an instruction read to the jury, Torres asked four times if he could address the court. The court allowed him to speak even though the jury was waiting to be brought in. Torres stated the prosecutor had humiliated him by referring to him as Mr. Torres instead of Ms. Torres, and the court had allowed it to happen. Torres also stated he wanted jury instructions on "the race issue" because he was "deprived of the benefit of racial diversity" during his arrest when the "Hispanic" and "Asian" officers from the Los Angeles Police Department were forced to turn him over to the California Highway Patrol at the insistence of one of the workers' compensation judges. The trial court told Torres it would allow him additional time to speak after the jury was instructed, but stated it did not believe the prosecutor had disparaged him and the jury had been instructed properly to ignore issues of bias based on race.

After the trial court read the corrected jury instructions, and addressed other matters with the parties, the court gave Torres additional time to address his concerns. Torres told the court he needed the California Highway Patrol to return the jacket he was wearing at the time of the incident so he could show it did not have an inside pocket. He repeated the arguments he made earlier that race was a factor in his arrest and prosecution. He accused the prosecutor of misrepresenting the depth of the wound on Mr. Rippinger's back and stated he wanted the paramedic report admitted into evidence. The trial court responded to the issues as Torres raised them.

16

Then Torres stated: "I do not want to continue to be part of this. This case is not in accordance with my wishes. The defense was not in accordance with my wishes. I did not want this attorney. This court has disrespected my constitutional rights, especially my Sixth Amendment right. You denied it to me by claiming I was just asking for an extension. I never asked for additional time. I asked for it so that I might -- you know, in an effort to try to at least save something, to do the closing myself. And I was not allowed to do that. [¶] You invoke some reports from a psychiatrist, but those are over a year ago. And I do not agree with those. I never said, you know, yes, I agree with those reports. I never agree with that. And those reports were -- those consultations were off the record."

The trial court responded: "All right. I will point out to you the way you ramble through these topics that are not pertinent to your trial is further evidence you would not be competent to represent yourself. Since an attorney would know that these are not appropriate topics. But your attorney can advise you on how to raise the concerns." Torres stated: "I'm not talking to my attorney anymore, at all. At all." The court stated: "That's your choice. [¶] We'll be in recess until we hear from the jury." Torres announced: "I do not want to be brought into the courtroom anymore."

When the proceedings resumed in the afternoon on February 10, 2012, the trial court explained to the prosecutor and defense counsel that Torres was refusing to leave his cell. Defense counsel told the court Torres had instructed counsel not to speak to him. The court stated: "So what I'm inclined to do, subject to your comment, is to go into the lockup with you [defense counsel] and [the prosecutor], and the reporter, to make a record that the defendant is, in fact, refusing to be present. . . ." The parties agreed with this procedure.

While in lockup on February 10, 2012, the trial court asked Torres whether he wanted to be in the courtroom "while we discuss important parts of your trial." Torres responded: "You did everything without my -- without my authorization and without my consent." The court explained: "If you come into the courtroom you will hear what we talk about. You will see what we might show or discuss visually [*sic*]. If you feel the

17

need to comment in addition to what your lawyer is saying, you'll be present to do that." Torres stated: "He's not my attorney." The trial court continued to urge Torres to go to the courtroom, but Torres told the court: "It is my choice to stay here and not go into the courtroom where I have been humiliated. Where my rights have been violated. My constitutional rights." The court told Torres, "It's hard for your lawyer to work without you." Torres responded: "I'm not working with him. He's not working with me. [¶] . . . [¶] You make it sound like we are working together. There is no such thing."

The proceedings resumed in the courtroom, with the parties and the trial court discussing how to respond to inquiries from the jury. After the court responded to the inquiries in open court, the court excused the jury for the weekend. Before adjourning, the court told the parties it would issue an extraction order for Torres if he refused to leave his cell on the next court day, when a read back of testimony was scheduled.

On February 14, 2012, the next court day, a deputy informed the trial court that Torres refused to leave his jail cell. The court issued an extraction order. When Torres arrived at the courthouse, the court decided to go back to lockup with the parties and the reporter. The court told Torres: "I'm here with my reporter. As you can see your attorney, Mr. Rodriguez is right here, and Ms. Williams [the prosecutor]." Torres responded: "He's not my attorney. I don't have an attorney. I do not -- I have something in writing, respect it. I do have my own attorney. I do not want -- I never wanted Mr. Rodriguez." The court asked Torres if he wanted to be present for the read back of trial testimony. Torres declined to be present, stating, "I cannot participate on [sic] the court proceedings that were against my wishes. I can't -- how am I gonna participate if it was against my wishes?" Torres told the court he wanted copies of all transcripts. The court asked if he wanted to talk privately with his attorney. Torres responded: "He's not my attorney. I have nothing to say to him." The court explained that it would tell the jury not to speculate about why Torres was not present during the read back of testimony. Torres suggested the court tell the jury he was absent "because you guys offended me and insulted me and stepped over my constitutional rights." When the court stated it was "not inclined to tell them that," Torres responded: "Of course

you're not. Of course you're not. Because you're a Nazi." When the court asked Torres what he had said, Torres repeated, "You're a Nazi." The court asked Torres if he wanted to say anything else, and Torres said he did, but he would rather write it down.

Back in the courtroom, defense counsel stated: "It occurs to me what we just witnessed may invoke a Marsden hearing. I wonder if she's entitled to an on-the-record hearing, in the absence of the prosecution, to illuminate her dissatisfaction with counsel." The court responded: "In my view not, since she's previously invoked, if not abused, the Marsden doctrine. And I'm not inclined to leave this case and the jurors in limbo while she thinks of an infinite number of ways she can pretend she's being abused or having problems. After the readback is concluded, you can consult with her and see if she wants to renew or somehow restate one of her Marsden positions. [¶] I think it's debatable whether some of her complaints rise to the level of a Marsden hearing. And as might be clear to you, I feel that she is a manipulative person who will do anything and everything that she can to avoid what she might perceive as the just consequences of her conduct. [¶] So for those reasons, I'm not inclined to have a Marsden hearing now. And if you want to renew this request after the readback, I'll be right here."

In the morning on February 15, 2012, the court decided to go back to lockup with defense counsel, the prosecutor and the reporter. The court stated: "I'm Judge Clarke, as you know. You recognize my voice, of course. Mr. Rodriguez is here to represent you." Torres responded: "I do not want his representation. I already said I do not want his representation. How many times do -- I have a right to represent myself. I invoke my right to represent myself. He's not putting my case -- he's turned my case into a complete mess, and now you want me to just participate? I mean, this is a decision that is going to change my life. The most -- probably the -- probably the most important decision in my life, and he completely made a mess of my case." The court asked Torres if he wanted to go to the courtroom to make a statement and/or to hear the remainder of the read back of testimony. Torres said he would go to the courtroom to make a statement, but "want[ed] to be pulled out right after that." Torres complained that prejudicial photographs—presumably the photographs of Rippinger's injuries—were

19

shown to the jury, that he was humiliated and "forced to go to trial while . . . sick," that he was "forced to go to trial in . . . prisoner's clothing"[11] and "wearing restrained devices," and that his "testimony was cut off by the District Attorney and she was allowed to lie and lie and lie." The court agreed that Torres could read a written statement in the courtroom after he finished writing it.

By the time Torres appeared in the courtroom, the trial court had been advised that the jury had reached a verdict. The court asked Torres if he wanted to read his statement before the jury came in and the verdict was read. Torres stated he would submit his statement for the record, but did not want to read it.[12] The court asked Torres if he wanted to be present when the verdict was read and Torres said he did not. Because Torres already was present and restrained to the chair, and the court believed it was important for him to be present, the court ordered him to remain in the courtroom. The court noted that there were five deputies in the courtroom. The verdict was read and the jury was polled. Torres answered "[y]es" on two separate occasions when the clerk asked a juror if this was his or her verdict.

After the trial court excused the jury, and the parties began discussing the date for sentencing, Torres stated he wanted to represent himself. He stated: "I want to invoke again my Sixth Amendment right to represent myself under Faretta versus California. I will not accept any type of -- I will not have any communication with Mr. Rodriguez. He mishandled my case. Based on what he did, and what he allowed the prosecutor to do, I'm not surprised a bit at the verdict. And therefore, I should be allowed to represent

---

[11] Torres declined to wear the clothes initially provided to him because they were men's clothing. The defense investigator purchased women's clothing for Torres. Torres wore a shirt, but then later complained that it was too small. Torres apparently declined to wear other women's clothing purchased by the investigator, so he went to court in his jail uniform.

[12] Torres's written statement is not included in the record on appeal. The court stated for the record that Torres had submitted a three and one-half page, handwritten statement.

myself. I was allowed to represent myself before. Whatever mental issue -- I never agreed with the claims of the psychiatrist. I used to have a job. I used to support myself. I used to pay my rent, my bills and I did every single month for me. So all of these things about me not being able to do things are just ridiculous."

The trial court ruled in this *Faretta* motion: "I'm going to deny your request to represent yourself at this stage of the proceedings. I do not feel that you're competent to undertake the challenging tasks ahead of you, which would include evaluating the factors to be argued at a sentencing hearing. To evaluate and perhaps present a motion for new trial, or any other post conviction motion that an attorney would present. [¶] I continue to feel, based on what I've read about you in the past, and what I've seen from your behavior in this court and in the lockup, and has been reported to me by the sheriffs, that you lack the competence, that you lack the emotional control to engage in the complex activities that you would need to represent yourself in this case in the stages that lie ahead of you. [¶] So under the authority of Indiana versus Edwards, which is a national standard, and People versus Johnson, which is California's recent approval of that standard, I'm exercising my discretion to deny you the right to represent yourself at this stage of the case."

Torres requested a new psychiatric evaluation. The trial court denied his request, stating, "I do not intend to appoint a psychiatrist for the limited purpose of evaluating your rights of self-representation at this point." The court explained that if defense counsel moved the court for such an evaluation, the court "might reconsider it." Torres asked for a new attorney, stating, "I don't have any communication with this attorney . . . ." The court denied the request, finding that any "communication problems" were of Torres's "own choosing."[13] The court ordered Torres to return for the sentencing hearing.

_____

[13] On appeal, Torres does not contend the trial court erred in denying this request for a new attorney.

On March 2, 2012, the trial court held the sentencing hearing in this matter. At the same time, the court held a hearing in the case against Torres for gassing. Torres was representing himself in the gassing case. In the instant case, Mr. Rodriguez appeared to represent Torres for sentencing; Torres requested permission to represent himself. Torres renewed his request for a new psychiatric evaluation, asserting the other evaluations were too old to be relevant, and the most recent one was invalid because he could not understand the doctor due to his accent. Torres also stated: "I'm an intelligent person and I should be allowed to represent myself. I'm sure Mr. Rodriguez is not gonna make a motion that he was, you know, not a good attorney in my case in order for me to get a new trial, or that false evidence was presented against me, you know, or anything like that."

The trial court explained it was "going to go through a list of some of the things that became known to [the court] handling the case that also support [the] decision." The court stated: "At the jail it was documented that you engaged in spitting, gassing and physical interference with sheriff's deputies. That you complained of library access problems, despite the fact that you voluntarily kept yourself in your cell and created disruptive circumstances which prevented you from going to the library. That you created hurdles for yourself in order to then claim you had the same hurdles in your case, which is consistent with your self-defeating, passive-aggressive, short-sided [*sic*] strategies, all of which make you a bad person to represent yourself." [¶] In terms of courtroom access, you refused to come out of your cell and had to be extracted by my orders on multiple occasions." The court also stated that Torres "spoke offensive[ly] towards two of [the] prosecution witnesses from the table at an inappropriate time and in an insulting fashion." Torres interjected: "You have had a very nasty way of viewing my mental problems. You have only brought up my mental problems to aggravate me. Not to help me, but to aggravate me." Torres repeatedly interrupted the court as it went through its list of reasons for denying Torres's request to represent himself.

The trial court continued: "During final argument you spoke out and waved a document from counsel table, referring to a paramedics report and findings in that report

which were not in evidence.  Again, inappropriate conduct for a defendant or an attorney. [¶]  You intentionally chose to display your restraint, the belt -- the stealth belt -- in the presence of the jury despite the fact that you were dressed by the bailiffs in a way so that the jury would not see that you were restrained, you chose to display.  [¶] . . . [¶]  And issues of judgment.  You focused much of your time on sheriffs providing you undergarments that suited your taste to the detriment of the legal issues and your cooperation with your attorney."[14]

The trial court further stated:  "You threatened to seek new counsel and sought new counsel on various occasions.  Seeking to fire your public defender.  Seeking to fire your appointed counsel.  Mentioning, alternatively, Marsden and Faretta at various times, as if they are light switches you could turn off and on as would suit you, to disrupt proceedings.  [¶]  You showed poor judgment in delivering your defense in writing to the court and prosecutor under the guise of a 995 [motion].  Not that [the prosecutor] needed a road map to your defense, but you hand wrote one for her so she knew exactly what you were saying.  Most competent defense attorneys would not choose that strategy.  [¶]  You testified on the witness stand in an argumentative and evasive fashion before the jury, and came across potentially, at least fitting the prosecution's argument, that you were an obsessed and [un]reasonable litigant in your workers compensation case, and that you should be viewed as such in the criminal case.  [¶]  You've offered, and then withdrew at various times, your cooperation with your lawyer, as if trying to manipulate him and make his job more difficult. . . ."  Finally, the court noted that Torres had referred to the court as both "a Nazi" and "a prosecutor."

---

[14] At multiple hearings, the trial court and defense counsel discussed Torres's dissatisfaction with the clothing provided to him by the jail and by the defense investigator.  Torres did not want to wear the underpants provided for him at the jail.  The trial court explained that "the Sheriffs have a policy against inmates classified as males wearing underwear for women."

23

The trial court proceeded with the sentencing in this matter.  Mr. Rodriguez represented Torres.  The court granted the prosecutor's motion to dismiss the case against Torres for gassing.

**Analysis on *Marsden* Issues**

Torres contends he was entitled to a *Marsden* hearing, outside the presence of the prosecutor, based on the comments he made on February 10 and 14, 2012, when defense counsel, the prosecutor and the court went to lockup to encourage him to return to the courtroom.  These comments, set forth above, are discussed further below.

As our Supreme Court has explained, "at any time during criminal proceedings, *if a defendant requests substitute counsel*, the trial court is obligated, pursuant to our holding in *Marsden*, to give the defendant an opportunity to state any grounds for dissatisfaction with the current appointed attorney.  [Citation.]" (*People v. Sanchez* (2011) 53 Cal.4th 80, 90, italics added; see also *People v. Vines* (2011) 51 Cal.4th 830, 878.)

During these conferences in lockup on February 10 and 14, 2012, Torres did not specifically request a *Marsden* hearing, as he had done before.  Nor did he request new appointed counsel or ask to substitute retained counsel.  Instead, he informed the trial court he would not work or speak with Mr. Rodriguez, and he did not consider Mr. Rodriguez to be his attorney.  It is clear from the record that Torres was seeking self-representation at this stage of the proceedings.  In fact, the reason the parties and the court were having this discussion with Torres in lockup is because Torres refused to return to the courtroom after the trial court denied his request to represent himself.

Torres asserts he did inform the trial court he wanted to substitute retained counsel.  He refers to the following comments he made on February 14, 2012, while in lockup:  "He's [Mr. Rodriguez] not my attorney.  I don't have an attorney.  I do not -- I have something in writing, respect it.  *I do have my own attorney*.  I do not want -- I never wanted Mr. Rodriguez."  (Italics added.)  Torres did not say he wanted privately retained counsel to represent him in this matter.  No other attorney attempted to appear on

Torres's behalf in this matter. Torres continued to request permission to represent himself. Thus, he was not entitled to a *Marsden* hearing based on these comments.

In *People v. Sanchez*, *supra*, 53 Cal.4th 80, the California Supreme Court disagreed with the Fifth District Court of Appeal's conclusion in *People v. Eastman* (2007) 146 Cal.App.4th 688 "that a *Marsden* motion can be triggered with something less than a clear indication by a defendant, either personally or through current counsel, that the defendant 'wants a substitute attorney.' [Citation.]" (53 Cal.4th at p. 90, fn. 3.) Torres relies on *People v. Eastman* in support of his arguments on appeal. Here, as discussed above, Torres did not inform the trial court he wanted a substitute attorney. And while his counsel questioned whether the court should hold a *Marsden* hearing based on Torres's comments in lockup on February 14, 2012, defense counsel did not state that Torres had requested substitute counsel.

Torres cites case law indicating an express request for replacement of counsel is not necessary to trigger a *Marsden* hearing where the defendant sets forth specific complaints about his attorney's alleged incompetence in a written motion for new trial and the court fails to address those complaints. (See *People v. Kelley* (1997) 52 Cal.App.4th 568, 579-580.) That case is not applicable to the facts before us. During the conferences in lockup on February 10 and 14, 2012, referenced on appeal in support of this *Marsden* claim, Torres did not list specific complaints about his counsel's performance. On numerous prior occasions, he had made the trial court aware of his specific complaints, which the court addressed. Torres does not argue the court erred on those prior occasions when the court addressed his complaints about his counsel's performance. During the conferences in lockup on February 10 and 14, 2012, Torres did not inform the court he had any particular complaints about his counsel's performance that he wanted to bring to the court's attention.

Torres's comments in lockup on February 10 and 14, 2012, were made during the course of his repeated requests to represent himself. "As the Attorney General correctly points out, defendant never requested different counsel [at that time]. Instead, he sought self-representation. His expressions of dissatisfaction with his attorney as a reason for

this decision are insufficient to require the court to inquire whether he wanted substitute counsel" during a *Marsden* hearing. (*People v. Frierson* (1991) 53 Cal.3d 730, 741.) The trial court did not err in declining to hold a *Marsden* hearing.

Even assuming the trial court did err, "*Marsden* does not establish a rule of per se reversible error," and Torres has not indicated how he was prejudiced. (*People v. Washington* (1994) 27 Cal.App.4th 940, 944 [denial of *Marsden* motion was not prejudicial where the defendant "made no showing . . . either that his *Marsden* motion would have been granted had it been heard, or that a more favorable result would have been achieved had the motion in fact been granted"].) Torres has not explained why the trial court might have granted a *Marsden* motion or what would have been different if it had. Based on our review of the record, we cannot make a finding of prejudice based on the trial court's decision not to hold a *Marsden* hearing.

**Analysis on *Faretta* Issues**

Torres contends the trial court erred in denying his "request to represent himself for purposes of sentencing and, potentially, a new trial motion."[15]

A criminal defendant generally "has a constitutional right to proceed *without* counsel when he voluntarily and intelligently elects to do so." (*Faretta*, *supra*, 422 U.S. 806, 807; *People v. Johnson* (2012) 53 Cal.4th 519, 531 (*Johnson*).) "A trial court must grant a defendant's request for self-representation if three conditions are met. First, the defendant must be mentally competent, and must make his request knowingly and intelligently, having been apprised of the dangers of self-representation. [Citations.] Second, he must make his request unequivocally. [Citations.] Third, he must make his request within a reasonable time before trial. [Citations.]" (*People v. Welch* (1999) 20 Cal.4th 701, 729.) As a matter of federal constitutional law, "when a motion to proceed *pro se* is timely interposed, a trial court must permit a defendant to represent himself upon ascertaining that he has voluntarily and intelligently elected to do so, irrespective of

---

[15] Mr. Rodriguez did not file a motion for new trial on Torres's behalf in this matter.

26

how unwise such a choice might appear to be." (*People v. Windham* (1977) 19 Cal.3d 121, 128 (*Windham*).)

A request for self-representation made during trial is not timely, and the trial court has discretion to deny it, even if the defendant is mentally competent and makes a voluntary, intelligent and unequivocal request. (*Windham*, *supra*, 19 Cal.3d at p. 124.) As the Attorney General acknowledges, there is California case law holding a request for self-representation is timely when it is made after the verdict is returned and a reasonable time before the sentencing hearing commences. (See *People v. Miller* (2007) 153 Cal.App.4th 1015, 1024.) The trial court does not have discretion to deny a timely request for self-representation if the defendant is mentally competent and makes a voluntary, intelligent and unequivocal request. (*Windham*, *supra*, 19 Cal.3d at p. 124.) As the Attorney General concedes, Torres's request for self-representation—the one at issue on appeal—was timely.

There is no dispute Torres's request for self-representation was unequivocal. Thus, we turn to the remaining condition required for a successful *Faretta* motion—the defendant's mental competence.

"Self-representation by defendants who wish it and validly waive counsel remains the norm and may not be denied lightly. A court may not deny self-representation merely because it believes the matter could be tried more efficiently, or even more fairly, with attorneys on both sides." (*Johnson*, *supra*, 53 Cal.4th at p. 531.) Our Supreme Court has concluded, "the standard that trial courts considering exercising their discretion to deny self-representation should apply is simply whether the defendant suffers from a severe mental illness to the point where he or she cannot carry out the basic tasks needed to present the defense without the help of counsel." (*Id.* at p. 530.) In *Indiana v. Edwards*, *supra*, 554 U.S. at page 176, the United States Supreme Court noted "'symptoms of severe mental illnesses'" include "'[d]isorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, [and] anxiety.'"

The trial court may but need not appoint a mental health expert to evaluate the defendant's competence to represent himself. (*Johnson*, *supra*, 53 Cal.4th at p. 530,

27

532.) "'[T]rial courts should be cautious about making an incompetence finding without benefit of an expert evaluation, though the judge's own observations of the defendant's in-court behavior will also provide key support for an incompetence finding and should be expressly placed on the record.' [Citation.]" (*Id.* at pp. 530-531.) A trial judge who "has observed the defendant on numerous occasions" "'will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant.' [Citation.]" (*Id.* at pp. 531-532, quoting *Indiana v. Edwards*, *supra*, 554 U.S. at p. 177.)

In reviewing the trial court's denial of a request for self-representation on mental incompetence grounds "we must defer largely to the trial court's discretion. [Citations.] The trial court's determination regarding a defendant's competence must be upheld if supported by substantial evidence." (*Johnson*, *supra*, 53 Cal.4th at p. 531.)

The record includes three expert reports, dated August 25, 2010, September 9, 2010, and April 4, 2011, all stating Torres was not mentally competent to represent himself. The fourth report in the record, dated October 19, 2010, states Torres was not mentally competent to stand trial and did not expressly address his competence to represent himself. The most recent report discussing Torres's incompetence to represent himself at trial was issued less than 11 months before Torres made the self-representation request at issue here. The trial court was not required to obtain a more recent expert evaluation before denying Torres's self-representation request on mental incompetence grounds. The trial court observed Torres's behavior on 13 court days and stated its observations for the record. The court also received reports about Torres's behavior from deputies at the jail and discussed these reports on the record.

The record demonstrates Torres's inability or unwillingness to follow courtroom procedures. He routinely interrupted the court. He also interrupted counsel during closing arguments and witnesses during trial testimony. He engaged in inappropriate name-calling. He addressed both the victim and a woman from the district attorney's office as "bitch," and called the trial judge a "Nazi." Moreover, based on his behavior at

28

the jail (gassing, spitting), he was required to wear a stealth belt restraint device and have five deputies present when the verdict was read.

Torres's obstructionist and self-defeating behavior is demonstrated in the record. He complained about lack of access to the law library even after he refused to go to the library on occasion and engaged in other behavior which prevented him from going. When it was time for him to testify in his defense, he said he was sick and had complained to jail staff about being sick, but there was no record of such a complaint. When court rulings did not go in his favor, he refused to leave his cell and return to court.

Torres's irrational thinking is a key factor cited in the April 4, 2011 expert report to support the conclusion that Torres was not mentally competent to represent himself. During trial, Torres sought to defend against the attempted murder charge by minimizing the victim's injury and by focusing on the race of the officers who arrested him. When speaking to the court, Torres jumped from topic to topic, often refusing to discuss the matter at hand.

Torres attributed bad motives to practically everyone associated with this case. As stated in the October 19, 2010 expert report, Torres believed the attorney from the public defender's office who represented him at the outset of these proceedings "may have been plotting against him with the district attorney in his case." He stated on the record repeatedly his belief that Mr. Rodriguez and the prosecutor were purposely trying to humiliate him. He complained that a woman from the district attorney's office was laughing at him during his testimony just as someone had been laughing at him during a prior trial. When the trial court was stating its reasons for denying Torres's request to represent himself, Torres asserted that the court was mentioning his "mental problems" only to "aggravate" him. The August 25, 2010 and October 19, 2010 expert reports both discuss Torres's paranoia as a factor supporting the conclusion that Torres was not competent to stand trial and/or represent himself.

Torres argues the behaviors the trial court referenced in support of its finding of mental incompetence are not relevant to a determination of whether Torres was mentally competent to represent himself in post-trial proceedings (motion for new trial and

sentencing) as opposed to a jury trial. We disagree. Torres's inability or unwillingness to follow courtroom procedures, his obstructionist and self-defeating behavior, and his irrational thinking all affect his ability to represent himself in post-trial proceedings.

The trial court did not abuse its discretion in denying Torres's request to represent himself based on a finding that he was mentally incompetent. Substantial evidence supports the finding that Torres "suffers from a severe mental illness to the point where he . . . cannot carry out the basic tasks needed to present the defense without the help of counsel." (*Johnson*, *supra*, 53 Cal.4th at p. 530.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


CHANEY, J.


We concur:


ROTHSCHILD, Acting P. J.


MILLER, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.