[No. G018069. Fourth Dist., Div. Three. Jan. 31, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
GERALD DEE KELLEY, Defendant and Appellant.

**COUNSEL**

Kathy M. Chavez, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Robert B. Shaw and Jean Hume, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WALLIN, J.**—Gerald Dee Kelley appeals his conviction for stalking, contending: (1) the stalking prosecution violated the statutory prohibition against successive prosecutions for crimes arising from the same course of conduct; (2) his prosecution violated the federal constitutional prohibition against double jeopardy; (3) he was entitled to additional custody credits; (4) the evidence was constitutionally inadequate to support the conviction; (5) the court erroneously admitted evidence of a prior offense; (6) the court erroneously failed to inquire into his complaints of inadequate counsel; (7) the court's reasons for imposing the aggravated term were inadequate; (8) the court failed to consider mitigating factors; (9) the sentence constitutes cruel and unusual punishment; and (10) the "Three Strikes" law violates the separation of powers clause of the state Constitution. We reverse and remand.

Kelley had married Michelle K. (Shelly's mother) when Shelly was 11 years old. Kelley began to fondle the child on a daily basis when she was sleeping, engaged in oral copulation episodes with her when she was 16, and had intercourse with her twice when she was 17. Shelly pushed him away

when he first began to fondle her, but she eventually gave up.[1] Her later compliance was apparently obtained through gifts and money bribes. As a result of this conduct, Kelley was convicted of lewd conduct with a child, and was sentenced to a six-year prison term.

Within a month or two after completing parole, Kelley contacted Shelly through her mother, saying he was dying of cancer and wanted to get together with her. Shelly agreed, and they had a few pleasant meetings. When Shelly moved into an apartment a few months later, however, Kelley came over without invitation, and on several occasions, asked her to recant her statements about the molestations and tell the family she lied.[2] He visited the apartment morning, noon, and night. He was there "all the time."

Five or six months after Shelly moved in, Kelley went to the apartment and pounded on the doors and windows. When no one responded, he punched a hole in the front door. Within a month, Shelly obtained a restraining order prohibiting Kelley from having any contact with her. Within 4 months, Kelley started calling Shelly at work every day, up to 50 or 60 times a week, even though he was told Shelly did not want to talk. He threw letters at her home and would fill her answering machine with messages.

Kelley sent Shelly a letter blaming her for his prison term. He said he was not going to be around much longer and Shelly wondered if she was going to "stay here very long either." He accused her of using the restraining order to destroy the bridges of friendship and trust he had tried to build. He wrote several times that "[l]ife is too short," and told her his was a love without end.

Soon after the letter, Shelly and her boyfriend moved into another apartment, and three days later Kelley showed up at her door. He continued to telephone and claimed her boyfriend had sold him the number. One day while she was riding her bicycle to work with a friend, Kelley came up behind them in a car and wanted to give Shelly a letter. When she refused it, he pulled in front of her and moved to the right, causing her to leap from the bicycle to avoid a collision.

Kelley kept coming to Shelly's residence when she gave some indication she was at home, such as opening the door to let the cat out. He finally wrote

---

[1]The first time they had intercourse, Kelley picked the lock to the bathroom where she was showering and entered. He entered her bedroom at night on the second occasion. Shelly did not want to have intercourse on either occasion, but there were no allegations of force or fear.

[2]His apparent motivation was to put himself back in their good graces.

her a letter saying he was very tired of trying to be her friend when all he got was rejection. He blamed her for lying about the molestations, but said he forgave her. He soon sent another letter saying he wanted to "settle the matter" between them, and to vindicate himself with her family. He indicated he went to prison because of her cover-up, and wanted to resolve the matter so they could go their own ways, "before it [got] any worse."

In another letter, Kelley complained that the restraining order was such a "drastic means" of getting him out of her life. He said he had to know her motivation because when he went to prison he lost everything he had worked for all his life. A few days after Shelly received the letter, Kelley followed her to a store. She became frightened and called the police, who arrested him. He was released, showed up on her doorstep three hours later, and was arrested again. Less than three months later, Shelly received a letter, purportedly from a third person but using the same typeface Kelley had used, which contained a poem and a penny with a heart shape cut out of it.

I

■ Kelley contends the prosecution for stalking violated Penal Code section 654's[3] prohibition against successive prosecutions for crimes arising from the same course of conduct, because he had already been prosecuted and convicted of contempt for violating the restraining order. Not so.

Section 654 states: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; an acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other." Although the plain language of the section might suggest otherwise, the section bars multiple prosecutions for offenses arising not only from a single act but also those arising from a course of conduct. (*In re Kent W.* (1986) 181 Cal.App.3d 721, 724 [226 Cal.Rptr. 512].)

As a result of his two arrests for violating the restraining order, Kelley was charged with and pleaded guilty to misdemeanor contempt in violation of section 166, subdivision (a) (4). He served 45 days in jail as a condition of his 3-year probation. About two months after his guilty plea, Kelley was charged with stalking, a violation of section 646.9. The information alleged the dates of violation were from April 1 through December 7, 1994, except the days that had been alleged in the contempt complaint. Kelley moved to dismiss the stalking information under section 654, but the motion was denied.

---

[3]All statutory references are to the Penal Code.

The Attorney General argues the "course of conduct" concept in section 654 is limited to acts occurring on one day. But the courts have not limited the concept in that fashion. (See, e.g., *In re Farr* (1976) 64 Cal.App.3d 605, 615-616 [134 Cal.Rptr. 595] [conduct occurring on multiple dates]; see also *People* v. *Bradford* (1976) 17 Cal.3d 8, 14 [130 Cal.Rptr. 129, 549 P.2d 1225] [explaining the prohibition against multiple prosecution is broader than that against multiple punishment, and that the test is whether one offense plays a "significant part" in the other].) Indeed, section 646.9 is defined in terms of a " 'course of conduct' . . . composed of a series of acts over a period of time . . . evidencing a continuity of purpose." (§ 646.9, subd. (f).) The acts alleged in the contempt proceeding leading to Kelley's arrests were part of an inseparable series of acts that showed a continuity of purpose.

But section 654 should not prohibit multiple prosecutions where, as here, at least some of the acts giving rise to the charge occurred *after* the prosecution for the related crime.[4] Although we have found no cases on point and the parties suggest none, the purpose underlying section 654's multiple prosecution prohibition is consonant with that result. The purpose of the prohibition is to prevent harassment of the defendant by successive prosecutions for the same conduct. (*People* v. *Bradford, supra*, 17 Cal.3d at p. 14.) Prosecution for a greater offense after the defendant has been punished and resumed the criminal behavior can hardly be characterized as harassment.

Moreover, the courts have expressed a concern that the section not be applied in a manner that would require the prosecutor to "throw the book" at the defendant to avoid giving the defendant effective immunity and to protect the prosecutor from charges of neglect of duty. (*People* v. *Turner* (1985) 171 Cal.App.3d 116, 129 [214 Cal.Rptr. 572].) This case presents a perfect example. As Kelley interprets section 654, the prosecution is precluded from ever prosecuting him for a felony even after he resumed his behavior. If that were the law, the prosecutor would have been forced to file a felony charge on the first occasion, even if a misdemeanor prosecution was appropriate at the time, for fear the prosecution could never file a felony if the conduct resumed. Under these circumstances, the prosecution was not

---

[4]By the dates alleged in the information and the evidence at trial, it appears Kelley resumed his aberrant behavior, albeit in the guise of a third person, about two months after he had been sent to jail, and probably within a month of his release.

precluded from filing felony charges when Kelley was not deterred the first time.[5]

## II

■ Kelley argues his prosecution violated the federal constitutional prohibition against double jeopardy.[6] The Fifth Amendment to the federal Constitution states in relevant part: "[nor shall any] person 'be subject for the same offense to be twice put in jeopardy of life or limb.'" The federal prohibition is applicable to the states. (*Benton* v. *Maryland* (1969) 395 U.S. 784, 793 [89 S.Ct. 2056, 2062, 23 L.Ed.2d 707].)

The double jeopardy clause prohibits an individual from being tried twice for the same offense or any included offense. In the case of an included offense, it matters not whether the greater or lesser offense was tried first. (*People* v. *Scheidt* (1991) 231 Cal.App.3d 162, 169 [282 Cal.Rptr. 228].) The test is whether each offense contains an element the other does not. (*United States* v. *Dixon* (1993) 509 U.S. 688, 696-697 [113 S.Ct. 2849, 2856, 125 L.Ed.2d 556].) Kelley asserts the crime of stalking in violation of a restraining order includes elements not found in the crime of contempt for violating such an order, but the latter crime contains all elements of the former.

In making this argument, he incorrectly assumes section 646.9 defines the crime of stalking in violation of a restraining order. The section merely defines stalking. The provisions relating to the violation of a restraining order do not define a crime.[7] They merely create a punishment enhancement. As such, they are not to be considered in the double jeopardy analysis. (See *People* v. *Bright* (1996) 12 Cal.4th 652, 665-666, 668-671 [49 Cal.Rptr.2d 732, 909 P.2d 1354] [double jeopardy not present when defendant is retried on enhancement for premeditated attempted murder].) Absent these provisions, the crimes are distinct and the constitutional prohibition against double jeopardy was not violated.

---

[5]We caution that we reach this result in a case involving a crime, stalking, that is predicated upon a continuing course of conduct. We do not suggest it applies to crimes that are completed by a discrete act.

[6]Kelley relied at trial on the state constitutional former jeopardy provision as well, but does not invoke it on appeal.

[7]Section 646.9 provides in relevant part: "(a) Any person who willfully, maliciously, and repeatedly follows or harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family, is guilty of the crime of stalking, punishable by imprisonment in a county jail for not more than one year or by a fine of not more than one thousand dollars ($1,000), or by both that fine and imprisonment, or by imprisonment in the state prison. [¶] (b) Any person who violates subdivision (a) when there is a temporary restraining order, injunction, or any other court order in effect prohibiting the behavior described in subdivision (a) against the same party, shall be punished by imprisonment in the state prison for two, three, or four years."

## III

■ Kelley claims he was denied adequate custody credits. To make this argument, he points to a portion of section 166, subdivision (d)(5), which reads: "[A]ny person held in contempt for a violation of subdivision (c) shall be entitled to credit for any punishment imposed as a result of that violation against any sentence imposed upon conviction of an offense described in Section 136.1 or 646.9." Since he was convicted of a section 646.9 violation, he reasons he was entitled to have the 45 days he spent in custody on the contempt violation credited against his felony sentence. In doing so, he fails to recognize subdivision (d)(5) is limited by its terms to "a violation of subdivision (c)." Subdivision (c) relates to restraining orders issued in criminal domestic violence cases.[8] The restraining order here was not issued in such a case, and Kelley acknowledges he was prosecuted for contempt under subdivision (a)(4).[9] Kelley was not entitled to additional credits.

## IV

■ Kelley asserts the evidence was constitutionally inadequate to support the conviction. He correctly notes the evidence is constitutionally adequate if a rational trier of fact could have found him guilty beyond a reasonable doubt based on the evidence at trial. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) We may not base our analysis on inferences drawn solely from speculation. (*People* v. *Morris* (1988) 46 Cal.3d 1, 21 [249 Cal.Rptr. 119, 756 P.2d 843].)

Section 646.9, subdivision (a) provides in relevant part: "Any person who willfully, maliciously, and repeatedly follows or harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety . . . is guilty of . . . stalking." Other subdivisions define the material terms.[10] Kelley contends the evidence was insufficient to

---

[8]Section 166, subdivision (c)(1) provides in relevant part: "[A]ny willful and knowing violation of any protective order or stay away court order issued . . . in a pending criminal proceeding involving domestic violence . . . or issued as a condition of probation after a conviction in a criminal proceeding involving domestic violence . . . shall constitute contempt of court . . . ."

[9]That subdivision makes criminal a contempt for "[w]illful disobedience of any process or order lawfully issued by any court."

[10]The subdivisions are (e), (f), and (g): "(e) For the purposes of this section, 'harasses' means a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose. This course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the person. [¶] (f) For purposes of this section, 'course of conduct' means a pattern of conduct composed of a

show he intended to place Shelly in fear for her safety,[11] arguing the evidence showed, at most, merely that she was afraid. He stresses he made no *express* threats, and the evidence showed he had great affection and concern for her. Even if all that is true, a rational juror could find the requisite intent.

Despite Kelley's affection and concern for Shelly, he had molested her repeatedly as a child, evidencing a willingness to harm her for his own purposes despite his expressed sentiments. He punched a hole in her door.[12] He ran her bicycle off the road with his car. He held her responsible for sending him to prison, implying she lied to accomplish the deed. He acted agitated and frenetic, and told her he wanted to "resolve" the matter before things got "worse."

Whether this was done with the intent to cause Shelly to fear for her safety was for the jury to decide. The jury could have concluded he intended her to suffer no fear from his actions, but the evidence was sufficient for it to decide otherwise by inferring his comments were intentionally veiled threats.

V

Kelley urges the trial court erred by admitting evidence of the prior molestation conviction. He correctly notes that evidence of such conduct should be admitted with great caution.[13] (*People* v. *Daniels* (1991) 52 Cal.3d 815, 856 [277 Cal.Rptr. 122, 802 P.2d 906] [other crimes evidence should be excluded unless the connection between it and present offense is clear].) He stresses that where, as here, the evidence is admitted to show the defendant's intent, "the uncharged misconduct must be sufficiently similar to support the

series of acts over a period of time, however short, evidencing a continuity of purpose. *Constitutionally protected activity is not included within the meaning of 'course of conduct.'* [¶] (g) For the purposes of this section, 'credible threat' means a verbal or written threat or a threat implied by a pattern of conduct or a combination of verbal or written statements and conduct made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety or the safety of his or her family and made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family. It is not necessary to prove that the defendant had the intent to actually carry out the threat. The present incarceration of a person making the threat shall not be a bar to prosecution under this section."

[11]Kelley also refers to a fear of great bodily injury and death, but the section was amended in 1993 to delete that language and replace it with a fear of safety. (Stats. 1993, ch. 581, § 1.)

[12]Kelley notes this incident occurred before Shelly got the restraining order, but it is relevant nonetheless to show his state of mind after the order was obtained.

[13]Evidence Code section 1101 prohibits evidence of specific instances of a person's conduct showing the person's character to prove how the person acted on a certain occasion, but makes an exception allowing evidence the person committed a crime to prove intent, motive, or other *material issues in the case.*

inference that the defendant ' "probably harbor[ed] the same intent in each instance." ' " (*People* v. *Ewoldt* (1994) 7 Cal.4th 380, 402 [27 Cal.Rptr.2d 646, 867 P.2d 757].) But *Ewoldt* involved the issue of common scheme and design, not intent, and the court did not intend to express a rule for all cases.

By its terms, Evidence Code section 1101, subdivision (b) allows other acts evidence to show "motive." Kelley's prior conviction and his attitude toward Shelly's alleged perjury to obtain it were relevant to show a motive to place Shelly in fear. The evidence was highly probative. It showed the extent of Kelley's obsession with Shelly and the cavalier way he was willing to treat her to satisfy his own desires.

Although such evidence is always prejudicial, the prejudice was minimized by proof of the conviction. It validated the evidence and minimized the chance a jury would punish him for the prior offense, for which he had already been punished. And, because molestation and stalking are different types of conduct, the chance a jury would find Kelley stalked Shelly just because he molested her was minimal.[14] The prejudicial effect did not outweigh the probative value, and the trial court did not abuse its discretion by admitting it. (See *People* v. *Ewoldt, supra,* 7 Cal.4th at pp. 404-405.)

## VI

■ Kelley contends the court erroneously failed to inquire into his complaints of inadequate counsel. He relies on *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44] and its progeny. In *Marsden,* the Supreme Court held that if a defendant seeks to have new counsel appointed due to present counsel's alleged incompetence, the trial court must inquire as to the reasons for the defendant's dissatisfaction and exercise its discretion in deciding whether to replace counsel. (*Id.* at p. 123.) The Supreme Court recently upheld the defendant's right to bring such a motion after trial in a new trial motion. (*People* v. *Smith* (1993) 6 Cal.4th 684, 695-696 [25 Cal.Rptr.2d 122, 863 P.2d 192].)

Kelley filed a written motion requesting a new trial, setting forth claims under penalty of perjury that his attorney refused to let him testify, and failed to subpoena, or failed to call, several material witnesses, the materiality of whom he set forth in detail. The trial court acknowledged the motion but said, "[I]t can be brought up [on appeal] with the assistance of your appellate counsel, but [it is not] really appropriate at the time that you brought [it] after the trial and before the sentencing."

---

[14]We realize stalking and molestation are both forms of conduct that are a tremendous affront and humiliation to the victim, but we are aware of no evidence or common perception that a molester is especially likely to be a stalker or vice versa.

Although Kelley did not expressly seek to have his attorney replaced, his complaints plainly set forth an arguable case of the attorney's alleged incompetence, the requisite ground for replacement of counsel under *Marsden*. (See *In re Hall* (1981) 30 Cal.3d 408, 420 [179 Cal.Rptr. 223, 637 P.2d 690] [recognizing failure to present exculpatory evidence as a ground for incompetence]; *People* v. *Robles* (1970) 2 Cal.3d 205, 214-215 [85 Cal.Rptr. 166, 466 P.2d 710] [defendant has right to testify, even over counsel's objections].)[15] Obviously, counsel would have a conflict of interest representing Kelley on a motion for new trial based on a prima facie showing of incompetence. (See *People* v. *Smith*, *supra*, 6 Cal.4th at p. 694.) And the Supreme Court continues to recognize a preference for resolving such issues, if possible, by way of a motion for new trial. (*Id.* at pp. 695-696.) For these reasons, Kelley's complaints related to his attorney's alleged incompetence were sufficient to trigger the need for a *Marsden* inquiry.

The trial court erred by failing to inquire as to the alleged incompetency. (*People* v. *Winbush* (1988) 205 Cal.App.3d 987, 992 [252 Cal.Rptr. 722] [court erred by refusing to hear defendant's purported in propria persona new trial motion alleging attorney incompetency].) The error is reversible per se, but we need not reverse for a new trial. We will order the court to hold a hearing complying with *Marsden*'s dictates. If Kelley ultimately does not show attorney incompetence, the court may reinstate judgment. (*People* v. *Winbush*, *supra*, 205 Cal.App.3d at p. 992.)[16]

Nothing about our conclusion should indicate Kelley's motion has merit. After inquiring of Kelley and counsel, the court may determine his claims are not credible or counsel's actions were within the acceptable range of attorney conduct and strategy. We rule only that the court must consider the claim and exercise its discretion.

---

[15]We recognize the general rule, "When the record fails to disclose a timely and adequate demand to testify, 'a defendant may not await the outcome of the trial and then seek reversal based on his claim that despite expressing to counsel his desire to testify, he was deprived of that opportunity.' [Citations.]" (*People* v. *Alcala* (1992) 4 Cal.4th 742, 805-806 [15 Cal.Rptr.2d 432, 842 P.2d 1192].) But that statement has been made when the defendant raised the substantive issue for the first time on appeal. We do not read that rule as precluding a defendant from showing counsel's alleged incompetency caused the apparent waiver.

[16]We have analyzed the issue assuming Kelley wishes to address his incompetency claim with the assistance of counsel. Although he purported to file other motions "in properia personan" (*sic*), he listed only trial counsel on his new trial motion and never asked for trial counsel to be relieved. If he wishes to represent himself on remand, the court must exercise its discretion on the issue, even though the verdict is in. (*People* v. *Rivers* (1993) 20 Cal.App.4th 1040, 1047-1052 [25 Cal.Rptr.2d 602].)

## VII

■ Kelley argues the court's reasons for imposing the aggravated term were inadequate. Not so. Although one of the factors was improper, the other factor adequately supported imposition of the aggravated term.

The trial court imposed a nine-year term, consisting of the aggravated term of four years (§ 646.9, subd. (b)) which the court doubled pursuant to the Three Strikes law (§ 667) based on Kelley's prior molestation conviction, and to which the court added a one-year enhancement due to the prior conviction under section 667.5. The court stated it was imposing the aggravated term because Shelly was particularly vulnerable as the victim of the prior molestation, and Kelley was a serious danger to society because he violated the restraining order.

The latter factor was improper. Although the restraining order was not an element of the crime, it was an element of the sentence enhancement for the crime under section 646.9. Section 1170, subdivision (b), and California Rules of Court, rule 420(d) prohibit using the same fact to enhance and aggravate a sentence. (*People* v. *Moreno* (1982) 128 Cal.App.3d 103, 110 [179 Cal.Rptr. 879].)

But a court needs only one factor to impose the aggravated term. (*People* v. *Piceno* (1987) 195 Cal.App.3d 1353, 1360 [241 Cal.Rptr. 391].) Kelley argues the other factor, Shelly's vulnerability, was invalid because she was not distinctly more vulnerable than any other stalking victim. He asserts she was not more easily stalked than other victims. Kelley fails to appreciate the scope of vulnerability. Even if she was as hard to stalk as other victims, the emotional impact of the stalking on her, Kelley's former molestation victim, was greater than it would be for others. In this sense, she was extremely vulnerable.[17] The court did not err in its finding.[18]

## VIII

Kelley claims the court failed to consider his bout with cancer and his attempt to "help" Shelly as mitigating factors. The court mentioned Kelley's cancer before trial as a possible "factor to take into consideration in imposing sentence." After imposing sentence the court noted, "I'm sure that you

---

[17]The trial court expressly noted, "[A]nother aspect . . . is the fact that the defendant's previous felony record was directly related to this same victim even before she became an adult, and that made her particularly susceptible."

[18]Moreover, it is not reasonably likely the court would have failed to impose the aggravated term, even in the absence of the factor relating to the violation of the restraining order. (*People* v. *Vacca* (1995) 38 Cal.App.4th 804, 809 [45 Cal.Rptr.2d 483].)

see yourself as someone who set out to help your daughter, to try and give her advice with regard to her boyfriend, to do a lot of things that you thought were helpful and protective." The court did not expressly mention the purported factors as mitigation when imposing the sentence, saying, "The circumstances in aggravation substantially outweigh any factors in mitigation."

A remand for resentencing is required when the court fails to consider relevant mitigating factors. (*People* v. *Strunk* (1995) 31 Cal.App.4th 265, 273-275 [36 Cal.Rptr.2d 868] [failure to consider three mitigating factors not listed in the probation report.) But in *People* v. *Scott* (1994) 9 Cal.4th 331 [36 Cal.Rptr.2d 627, 885 P.2d 1040], the Supreme Court held ". . . the waiver doctrine should apply to claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices . . . " (*id.* at p. 353), and the decision applies prospectively to cases such as Kelley's.[19] (*Id.* at pp. 356-357.) Kelley's counsel noted the probation report listed no mitigating factors and suggested the lack of harm to Shelly or any property damage should be considered in mitigation. Although the trial court invited her to cite any sentencing errors under *Scott*, she never suggested the factors Kelley argues on appeal, and he will not be allowed to argue them now.[20]

Even if we considered the issue, Kelley would not prevail. The trial court expressly indicated "[t]he circumstances in aggravation substantially outweigh any factors in mitigation." The court is presumed to have considered all relevant factors unless the record affirmatively shows the contrary. (Cal. Rules of Court, rule 409; *People* v. *Superior Court* (*Du*) (1992) 5 Cal.App.4th 822, 836 [7 Cal.Rptr.2d 177].) If the factors Kelley urges on appeal were truly mitigating, we presume they were considered since the court was aware of, and mentioned, them during various parts of the proceedings.[21]

The factors were not mitigating in any event. Kelley does not suggest the cancer affected him in any way during the commission of the crime. And even if terminal cancer is a mitigating factor for sentencing purposes, nothing in the record reflects Kelley's cancer would be lethal. As to the other purported factor, immediately after the court made reference to Kelley's

---

[19]Kelley was sentenced in 1995.

[20]Kelley does not urge on appeal the purported mitigating factor raised by trial counsel. Kelley complained personally to the trial court he was unable to present mitigating factors, but he did not say what they were.

[21]Indeed, Kelley submitted documentation at sentencing mentioning his cancer, which the court reviewed and which would have refreshed the court's recollection had the court forgotten.

opinion he was merely trying to help Shelly, the court added, "The problem is that the rest of the world doesn't see it that way, and when a judge told you enough is enough, stay away, you still didn't get the message, and that's part of the problem—that you have a hard time getting the message, sir." The statement suggests the court did not see Kelley's view as mitigating.

## IX

■ Kelley asserts his nine-year sentence constitutes cruel and unusual punishment under *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697]. In *Dillon,* the Supreme Court held a sentence can be unconstitutionally cruel and unusual if it is grossly disproportionate to the offender's culpability. (*Id.* at pp. 477-478.) But because Kelley failed to raise the issue below, it is waived. (*People* v. *DeJesus* (1995) 38 Cal.App.4th 1, 27 [44 Cal.Rptr.2d 796].)

Even if he had raised the issue, he could not prevail. Successful challenges based on proportionality are extremely rare. (*People* v. *Weddle* (1991) 1 Cal.App.4th 1190, 1196 [2 Cal.Rptr.2d 714].) The defendant must show the sentence is " 'out of all proportion to the offense' " and that it offends "fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424 [105 Cal.Rptr. 217, 503 P.2d 921], fn. omitted.) Kelley's conduct was what offends fundamental notions of human dignity. Whatever his ultimate motive, he set upon a protracted campaign of harassment against his former child molest victim. He was not deterred in the least when a court told him to stop it. His recidivism (*People* v. *Karsai* (1982) 131 Cal.App.3d 224, 242 [182 Cal.Rptr. 406]), his resistance to the court process, and the emotional harm to Shelly amply justified his prison term.

## X

Kelley urges precluding the trial court from striking his prior conviction on its own motion violates the separation of powers doctrine. The Supreme Court embraced that argument in *People* v. *Superior Court (Romero)* (1996) 13 Cal.4th 497, 513 [53 Cal.Rptr.2d 789, 917 P.2d 628]. *Romero* is fully retroactive, and "on direct appeal, a defendant serving a prison term pursuant to [the Three Strikes law] imposed 'by a court that misunderstood the scope of its discretion to strike prior felony conviction allegations in furtherance of justice' [citation] is entitled to a remand for reconsideration of the sentence. Of course, as mandated by *Romero*, remand is inappropriate if the record 'clearly indicated [the sentencing court] would not, in any event, have exercised its discretion to strike the allegations.' [Citation.]" (*People* v. *Sotomayor* (1996) 47 Cal.App.4th 382, 390 [54 Cal.Rptr.2d 871].)

The trial court did not indicate whether it would strike the prior conviction to ameliorate the prison sentence if it had the discretion to do so. The court can clarify the record on remand and decide whether to exercise its discretion.

The judgment is reversed and the matter is remanded for the trial court to hear and consider Kelley's complaints about his trial attorney's competence, to exercise its discretion on whether to appoint new counsel (if Kelley does not desire to represent himself) and to consider a motion for new trial on that ground. If the trial court does not find adequate grounds to pursue a new trial motion, it shall reimpose judgment after exercising its discretion to determine whether to strike Kelley's prior conviction for sentencing purposes.

Crosby, Acting P. J., and Rylaarsdam, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 23, 1997.