Filed 3/25/16  P. v. Sandoval CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B262643 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA120651) |
| v. | |
| ISAIAS SANDOVAL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael A. Cowell, Judge.  Affirmed.

Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and Robert C. Schneider, Deputy Attorney General, for Plaintiff and Respondent.

Defendant and appellant Isaias Sandoval (defendant) admitted in a recorded interview with members of the Los Angeles County Sheriff's Department that he accompanied fellow gang member Jesus Bugarin (Bugarin) on an armed robbery at a home occupied by Sergio Oropeza (Oropeza). During the robbery, Bugarin shot and killed Oropeza, and a jury found defendant guilty of the murder of Oropeza under the first-degree felony-murder rule. We are asked to decide whether the trial court erred in imposing a 25-to-life prison term on defendant as the result of a sentencing enhancement that applied because of Bugarin's discharge of the firearm during the robbery. We also consider claims of prosecutorial misconduct and instructional error.

## I.  BACKGROUND

On September 13, 2010, Victor Zambrano (Zambrano) saw a man wearing a blue t-shirt (Bugarin) force Oropeza into his own garage. Zambrano was visiting Oropeza's neighbor, Fernando Salcedo (Salcedo), at the time. Another man (later identified as defendant) then walked very quickly up Oropeza's driveway, entered the garage and closed the door behind him. Zambrano heard a noise that sounded like banging on walls; Salcedo described the noise as the sound of fighting. Oropeza's six-year-old son Kevin who was present in the home also heard a noise, which sounded like his father was being hit. Kevin called out to his father.

The garage door opened and two men came out with Oropeza. According to Kevin, the men were kicking his father. According to Zambrano, the two men ran out of the garage, followed by Oropeza. Oropeza tried to grab Bugarin, and Bugarin turned and shot Oropeza. Salcedo saw both men, who were young and Latino, run toward Live Oak Street.

Alba Mejia was walking on Live Oak Street, heard gunshots, and saw two men run out of the driveway of a house. They ran to a white car, which had a driver sitting in it. The car drove away after the two men got inside.

2

Oropeza died from two gunshots, one to his chest and the other to his back. The shots were fired from a .40 caliber semi-automatic handgun, consistent with a Sig Sauer. Oropeza also had injuries to his head.

For reasons that were not discussed by the witnesses at trial, law enforcement officers suspected defendant of being involved in the robbery-murder and arrested him. After his arrest, Los Angeles County Deputy Sheriff Tyrone Berry interviewed defendant in jail. Deputy Berry was part of a task force that had investigated a gang calling itself JBI, and Berry had previous contacts with defendant, who was a member of JBI.

During the interview, which was recorded and played for the jury, defendant stated that Bugarin, also a JBI gang member, and "Kid" targeted Oropeza for robbery because he was believed to have a lot of money in his house. Defendant admitted he was part of the planning for the robbery. He said that he was picked up by Bugarin and that together they went to the area of Oropeza's home. The two men drove around the block a few times, and defendant was worried about "jacking" Oropeza without more manpower. He asked Bugarin how he was planning on carrying out the robbery alone, telling him he was a "stupid fool" for attempting it. Bugarin told defendant that others, including "Chon," were present nearby. Defendant saw them in a minivan, but was still concerned because Chon knew the victim and could link them to the crime. Bugarin told defendant that "Royal," another JBI gang member, was also present. Defendant then saw Royal's Acura parked nearby, and agreed to continue with the crime. At that point, defendant saw Oropeza, the man they "were planning to rob," come out of his house and go into the garage. When defendant saw Oropeza, he realized that he was a "[b]ig ass dude."

Bugarin then said he was going to "go get him," and defendant asked "where's the strap [gun] at?" Bugarin pulled a .40 caliber firearm out of his waistband. Defendant asked whose gun it was, and Bugarin stated that it belonged to "Biggie," another JBI gang member. Defendant said, "all right." Bugarin told defendant to "[c]ome on." Defendant said that he did not have a gun, and asked "[h]ow the fuck am I going to go back there fool?" Nevertheless, defendant followed Bugarin while talking on a cell phone.

3

Bugarin rushed Oropeza and they began fighting inside the garage. Defendant ran toward the fight. He gave varying accounts of what happened next. Initially, defendant said Bugarin shot Oropeza when he ran out of the garage toward defendant. Defendant claimed that he was still talking on his phone outside the garage at the time. Later in the interview, defendant stated that he had hung up the phone either during the struggle between Bugarin and Oropeza or when Oropeza came out. Defendant also stated that he "tried to run in [as Oropeza] tried to run out." Deputy Berry asked defendant why he thought Bugarin went inside the garage by himself with such a big victim, and defendant replied that it was because "he was thinking that if you're going to pull out the gun on him, that guy was going to comply."

In addition to playing Deputy Berry's recorded interview of defendant for the jury, the prosecution also elicited expert testimony from Berry about the JBI gang. The gang had 50 to 60 members. Bugarin, defendant, Royal, and Biggie were members. Defendant had a JBI tattoo on his stomach. According to Berry, the JBI gang was a ruthless gang with many rivals and a very strong reputation for violence. Berry testified that the gang's primary activity was home invasion robberies, particularly when they believed the victims had a lot of money or a large quantity of narcotics. They also committed murders and intimidated witnesses. The predicate crimes Deputy Berry testified to included a multiple murder offense and manslaughter. It was Deputy Berry's expert opinion that the murder in this case was committed in association with and for the benefit of the JBI gang.

The jury convicted defendant of first-degree murder in violation of Penal Code[1] sections 187 and 189. The jury found true the allegations that the murder was committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1)(C). Importantly for purposes of this appeal, the jury further found, as the information charged, that a principal personally used and intentionally discharged a firearm causing death within the meaning of section 12022.53, subdivisions (b), (c), (d),

---

[1] All undesignated statutory references that follow are to the Penal Code.

4

and (e)(1). The trial court found true the allegation that defendant had suffered a prior serious or violent felony within the meaning of sections 667, subdivisions (b) through (i), and 1170.12 (the Three Strikes law). The court sentenced defendant to a 25 years to life term for the murder, doubled pursuant to the Three Strikes law, plus a 25 years to life term pursuant to section 12022.53, subdivisions (d) and (e)(1).

## II. DISCUSSION

Defendant contends the section 12022.53 enhancement term was erroneously imposed because he was not a "principal" in the murder. He also argues that imposition of the enhancement violates his right to due process and constitutes cruel and unusual punishment under the United States and California Constitutions. Defendant further contends that the prosecutor committed misconduct in closing argument, and that the trial court erred in failing to instruct the jury that mere presence at the scene of a crime is not sufficient to establish liability as an aider and abettor. We conclude these arguments lack merit and affirm the judgment of conviction.

### A.    *The Section 12022.53 Firearm Enhancement*

When a principal uses or discharges a firearm in the commission of an offense enumerated in section 12022.53 and the offense is committed for the benefit of a criminal street gang, subdivision (e)(1) requires a court to impose an enhancement term on a non-shooting accomplice if that person is also "a principal in the commission of an [enumerated] offense."[2] Murder is an enumerated offense. (§ 12022.53, subd. (a)(1).) Defendant contends that he was not a principal in the commission of the felony murder

---

[2]    Subdivision (e)(1) provides in full: "The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved: [¶] (A) The person violated subdivision (b) of Section 186.22. [¶] (B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d)."

and the trial court therefore erred in imposing a subdivision (e)(1) enhancement term as part of his sentence.[3]

As a matter of statutory definition, defendant was a principal in the commission of the felony murder. Parties to a crime are classified as either principals or accessories. (§ 30.) The difference in classification relates to timing. (See *People v. Montoya* (1994) 7 Cal.4th 1027, 1039.) Section 31 defines a principal as any person "concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission." (§ 31.) A person who aids a principal "after a felony has been committed," by contrast, is an accessory. (§ 32.) The evidence shows that defendant was concerned in the commission of the felonies in this case. He was not tried as, or convicted of being, an accessory who provided assistance only after those felonies were committed. There is no third classification of parties to a crime under California law.

Defendant, however, proceeds as if there is a third classification for parties to felony murder. He correctly notes that principals are subdivided into perpetrators and aiders and abettors (§ 31), and he argues that he does not fall into either subcategory. There is no evidence that defendant was the perpetrator of the murder, and he contends he cannot be an aider and abettor because he did not know of or intend to aid and abet the murder. He emphasizes the jury made no determination about whether he knew of or intended to commit the murder because he was found guilty only under a felony-murder theory. This, of course, is true of all persons who are not the perpetrator of a murder and are convicted of murder solely under the felony-murder doctrine. Defendant believes such persons should be designated by a term other than aider and abettor and he supports his argument with the assertion that our Supreme Court has begun to avoid using the term

---

[3]    Defendant also argues the term "principal" should be read narrowly in the felony-murder context because treating the non-shooter as a principal would erode the relationship between criminal liability and moral culpability. We consider this argument in part C, *post*.

6

"aid and abet" in felony-murder cases. His chief example is *People v. Thompson* (2010) 49 Cal.4th 79, 116-177.

While the court in *Thompson* occasionally uses the word "accomplice," the opinion in fact confirms that "aider and abettor" is an accurate term for a person who is convicted of felony murder without being the actual killer. We illustrate by quoting in part the section of the *Thompson* opinion entitled "Aider and Abettor to Felony Murder": "Under the felony-murder rule, an accomplice is liable for killings occurring while the killer was acting in furtherance of a criminal purpose common to himself and the accomplice, or while the killer and the accomplice were jointly engaged in the felonious enterprise. (*People v. Pulido* (1997) 15 Cal.4th 713, 719.) In order to support *defendant's conviction as an aider and abettor*, therefore, the record must contain substantial evidence that (a) [the direct perpetrator] committed the robbery (the perpetrator's actus reus), (b) defendant knew [the direct perpetrator's] intent to rob and intended to assist in the robbery (the aider and abettor's mens rea), and (c) defendant engaged in acts that assisted the robbery (the aider and abettor's actus reus)." (*People v. Thompson*, *supra*, 49 Cal.4th at p. 117 [italics added].) We see nothing in *Thompson* or the other cases cited by defendant that undermines the long-standing rule that a defendant who aids and abets the underlying felony is described and treated as an aider and abettor of felony murder. Defendant's argument fails for that reason; while the section 12022.53 enhancement would not apply if defendant were a mere accessory after the fact, the record demonstrates that he was not a mere accessory but instead was fully "concerned in the commission of a crime."

### B.     *Jury Instruction on the Section 12022.53 Allegation*

Although he does not present the claim under a separate heading in his brief as required by California Rules of Court, rule 8.204(a)(1)(B), defendant also appears to argue the section 12022.53, subdivision (e)(1) enhancement was erroneously imposed because the jury was not properly instructed that it must find defendant was a principal in the murder and that the shooter, Bugarin, who was not a defendant in this case, was a

7

principal in a malice murder. Even if we treat the issue as properly before us notwithstanding non-compliance with the rule, we would conclude there was no error. Defendant's argument is premised primarily on his erroneous belief that no one can be a principal in a felony murder, including the shooter.

The jurors were instructed with a standard version of CALCRIM No. 1402, which correctly informed the jurors that the enhancement applied only if they found defendant "guilty of the crime charged in Count 1." Because the crime charged in count 1 was felony murder, a conviction on that charge necessarily means the jury found defendant was a principal in the felony murder. For reasons we have already discussed, we reject defendant's contention that one cannot be an aider and abettor of felony murder. CALCRIM No. 1402 also required the jury to find that "someone who was a principal in the crime [i.e., the felony murder charged in Count 1]" discharged a firearm during the commission of the crime, and the instruction also described what it means for someone to be a principal in the commission of a crime. The jury was also given a felony-murder instruction, CALCRIM No. 540B, designed to be used when a co-participant allegedly committed the fatal act. Thus, the jury necessarily found that Bugarin (the co-participant) was, like defendant, a principal in the felony murder, and the instructions given ensured that the jurors made all the requisite findings for the section 12022.53 enhancement to apply. To the extent that defendant contends section 12022.53, subdivision (e)(1) requires conviction of the actual shooter, defendant is mistaken. (*People v. Garcia* (2002) 28 Cal.4th 1166, 1175.)

### C.    *Due Process*

Defendant claims treating him as a principal under section 12022.53 violates the Due Process Clauses of the Fifth and Fourteenth Amendment to the United States Constitution because it imposes criminal liability without regard to personal culpability.[4]

---

[4]    Defendant presents similar contentions in the first section of his opening brief to support his argument that he should not be treated as a principal in the felony murder. He claims that imposing a firearm enhancement for murder absent a requirement that a

8

Generally, due process requires that criminal liability rest on personal guilt; personal guilt requires "guilty knowledge and intent." (*People v. Castenada* (2000) 23 Cal.4th 743, 749, citing *Scales v. United States* (1961) 367 U.S. 203, 228.) "The primordial concept of mens rea, the guilty mind, expresses the principle that it is not conduct alone but conduct accompanied by certain mental states that concerns or should concern the law." (*People v. Hernandez* (1964) 61 Cal.2d 529, 532.)

With respect to felony-murder culpability, "[t]he purpose of the felony-murder rule is to deter those who commit the enumerated felonies from killing by holding them strictly responsible for any killing committed by a cofelon, whether intentional, negligent, or accidental, during the perpetration or attempted perpetration of the felony. ([*People v.*] *Burton* [(1971)] 6 Cal.3d [375,] 388.) 'The Legislature has said in effect that this deterrent purpose outweighs the normal legislative policy of examining the individual state of mind of each person causing an unlawful killing to determine whether the killing was with or without malice, deliberate or accidental, and calibrating our treatment of the person accordingly. Once a person perpetrates or attempts to perpetrate one of the enumerated felonies, then in the judgment of the Legislature, he is no longer entitled to such fine judicial calibration, but will be deemed guilty of first degree murder for any homicide committed in the course thereof.' (*Ibid.*)" (*People v. Cavitt* (2004) 33 Cal.4th 187, 197; accord, *People v. Wilkins* (2013) 56 Cal.4th 333, 346 [felony-murder rule "does not take into account the relative culpability of the defendant's actions or state of mind"].)

---

defendant aid and abet the murder (as opposed to the predicate felony) would completely erode the relation between criminal liability and moral culpability, offend principles of culpability by adding a consecutive life term even where an accomplice's discharge of a gun is unforeseen or unintended, and violate the fundamental principle that penal statutes must have a mental element that corresponds to culpability. Our resolution of defendant's due process claim applies to these claims as well.

Defendant contends that section 12022.53, subdivision (e)(1) contains no mens rea requirement,[5] and he claims he had no culpable mental state related to the murder of Oropeza. He argues it violates due process to add a consecutive 25-to-life prison term to his sentence for the unintended and unforeseen happenstance that an accomplice fired a gun.

Defendant, however, is not being punished without regard to his personal culpability or mental state. No defendant can have his sentence enhanced under section 12022.53 for an accomplice's use of a firearm unless the defendant commits an enumerated offense with the specific intent to benefit a criminal street gang. (Subd. (e)(1)(A).) It was essentially undisputed that defendant had such an intent in this case. In addition, no defendant can be convicted of felony murder as an aider and abettor unless he has knowledge of and the intent to assist in one of the specified underlying felonies. Here, defendant's knowledge of and intent to assist in two such felonies were shown: burglary and attempted robbery. Furthermore, although knowledge that an accomplice is armed is not an element of section 12022.53, the evidence in this case demonstrated defendant did know his accomplice and fellow gang member Bugarin was armed. In fact, according to defendant's own admission, he made sure to verify Bugarin was armed before he (defendant) decided to go forward and participate in the robbery.[6]

---

[5]     This court has twice rejected the claim that subdivision (e)(1) violates due process because it imposes an enhancement on an aider and abettor without any requirement that the aider and abettor know that his accomplice intended to use or discharge a firearm. (*People v. Gonzales* (2001) 87 Cal.App.4th 1, 15; see *People v. Hernandez* (2005) 134 Cal.App.4th 474, 483.)

[6]     It was also foreseeable, under the circumstances, that Bugarin would use or discharge the firearm he brought to facilitate the robbery because the absence of additional manpower made it more likely that Oropeza might resist. Defendant understood that Bugarin intended to rely on a display of the firearm to obtain the victim's compliance, but remained concerned that Bugarin intended to rob Oropeza without bringing more people with him, particularly since Oropeza was a "big ass dude."

We also find it significant that section 12022.53, subdivision (e)(1) is not limited to the use or discharge of a firearm during a murder.  Section 12022.53 enhancements apply to the use or discharge of a firearm during a robbery as well.  (Subd. (a)(4) & (18).)  Defendant's admissions prove he knew of and intended to assist in an armed robbery and there can thus be no dispute defendant would have direct personal culpability for the robbery.  If Bugarin had simply discharged the firearm in the commission of the attempted robbery without harming anyone, defendant would have received a 20-year enhancement.  (Subd. (c).)  If Bugarin had inflicted great bodily injury on Oropeza, but not killed him, defendant would have received the same 25-to-life sentence of which he now complains.  (Subd. (d).)  Thus, defendant had the culpable mental state for the underlying felony of robbery that he contends is lacking from the underlying felony of killing.  Since that culpable mental state would support a 25-to-life enhancement for the infliction of great bodily injury in the commission of a robbery, it does not erode the relationship between criminal liability and personal culpability to impose a 25-to-life enhancement on defendant because Bugarin killed rather than seriously injured Oropeza during the course of the robbery.[7]  There has been no violation of defendant's due process rights.

### D.     Cruel and Unusual Punishment - Federal

Defendant contends imposing the section 12022.53 enhancement constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

During the trial court proceedings, defendant did not argue the section 12022.53 enhancement constitutes cruel and unusual punishment.  This issue of whether a sentence is cruel and unusual punishment is a fact intensive inquiry under both state and federal law, and is based on the nature and facts of the crime and offender.  (*People v. Weddle*

---

[7]     We note that defendant has not contended that section 12022.53, subdivision (e)(1) violates due process on its face.  He contends that it violates due process as applied to him.

11

(1991) 1 Cal.App.4th 1190, 1196; see also *Solem v. Helm* (1983) 463 U.S. 277, 287 [question of disproportionate punishment cannot be considered in the abstract].) It is forfeited if not raised in the trial court. (*People v. Kelley* (1997) 52 Cal.App.4th 568, 583; *People v. DeJesus* (1995) 38 Cal.App.4th 1, 27; see generally *People v. Trujillo* (2015) 60 Cal.4th 850, 856 [reaffirming that even constitutional claims can be forfeited]; *People v. Scott* (1994) 9 Cal.4th 331, 356.) Here, defendant did make a *Romero*[8] motion to strike his prior conviction under the Three Strikes law, but his only argument for doing so was the contention that the prior conviction was too old to consider. Thus, he did not develop facts relating to him individually that would permit a proportionality review.

Even if defendant's claim were not forfeited, it would not succeed. The California Supreme Court has upheld the imposition of a 25-to-life enhancement term for a defendant who was not the shooter. (*People v. Garcia* (2002) 28 Cal.4th 1166, 1169-1170.) Defendant, however, relies on the Supreme Court's recent opinion in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), which considers the requirements of section 190.2, subdivision (d), a statute that extends the death penalty to aiders and abettors who are "major participants" in felony murders. *Banks* does not control the result here; we are not concerned with the application of section 190.2. However, even assuming for argument's sake that the rationale in *Banks* would apply here because the 25-to-life enhancement is part of an overall sentence that exceeds defendant's life expectancy,[9] *Banks* does not compel the conclusion that defendant's sentence is unconstitutional.

---

[8]      *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

[9]      Defendant contends his 75-to-life sentence is effectively a life without the possibility of parole (LWOP) sentence because it exceeds his normal life expectancy. In juvenile cases, very long sentences with eligibility for parole are treated as "functional" or "de facto" LWOP sentences if there would be no meaningful life expectancy left when the offender becomes eligible for parole. (See, e.g., *People v. Perez* (2013) 214 Cal.App.4th 49, 55-58, and cases cited therein.) Defendant has not cited, nor are we aware of, any cases applying the de facto LWOP concept to adult sentences.

12

The *Banks* court considered the development of case law specific to section 190.2, subdivision (d)[10] and held that a true finding under that subdivision must be supported by proof that the defendant was a major participant in the crime, as that term is used in common parlance, and must have acted with "reckless indifference to human life." (*Banks*, *supra*, 61 Cal.4th at pp. 800-801.) These two elements, major participation and reckless indifference, create a spectrum of culpability, with on one extreme a mere getaway driver "like 'Enmund himself: the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state," and on "the other extreme [] actual killers and those who attempted or intended to kill." (*Id.* at p. 800.) To decide where on that spectrum a given defendant falls, our Supreme Court identified a series of factors courts should consider, namely, the role the defendant had in planning the crime; the role the defendant had in supplying or using lethal weapons; the defendant's awareness of particular dangers posed by the nature of the crime, weapons used, or the past experience of other participants; whether the defendant was present at the scene of the killing in a position to facilitate the crime; whether the defendant's actions or inaction played a role in the death of a victim; and any facts concerning what the defendant did after lethal force was used. (*Id.* at p. 803; see also *id.* at p. 801 ["apparent consensus" that substantial participation in violent felony under circumstances likely to result in loss of life demonstrates reckless indifference to a significant risk of death].)

Were we to consider these factors in this case, we would hold defendant is not at all like a mere getaway driver such as Leon Banks. Defendant was present at the scene of the robbery in a position to facilitate the crime; he helped plan the robbery and was not only aware Bugarin was armed but made sure to verify that Bugarin had "the strap" before executing the plan; he was aware the plan was dangerous because of the chance

---

[10]     *Tison v. Arizona* (1987) 481 U.S. 137 and *Enmund v. Florida* (1982) 458 U.S. 782.

that Oropeza would resist; and he fled with Bugarin after the use of lethal force rather than assisting Oropeza or calling for help.[11]

There is no question that defendant received a long sentence based on the sentencing enhancements that the Legislature has seen fit to enact. But defendant's circumstances are different from those of the defendant in *Banks*. We therefore do not read that decision to authorize reversal of the relevant statutory sentencing enhancements here.


### E. Cruel and unusual punishment - California

Defendant has also forfeited his claim that his sentence is cruel and unusual under Article I, section 17 of the California Constitution by failing to object on that ground in the trial court. (*People v. Kelley*, *supra*, 52 Cal.App.4th at p. 583; *People v. DeJesus*, *supra*, 38 Cal.App.4th at p. 27.) As we discuss above, defendant did not develop facts relating to him individually that would permit a proportionality review.

Even if the claim were not forfeited, it would not succeed on this record. Defendant relies on *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*) and *People v. Chun* (2009) 45 Cal.4th 1172 (*Chun*) to argue his sentence for felony murder is cruel and unusual. Both cases limit liability, and hence punishment, for certain instances of what

---

[11]     That the section 12022.53 enhancement is only *part* of defendant's sentence is further reason why *Banks* does not help defendant; it undermines defendant's effort to treat the section 12022.53 enhancement as the reason why a "de facto" LWOP sentence was imposed. Unlike a defendant who receives an LWOP sentence under section 190.2, defendant's aggregate sentence is a result of four different aspects of wrongdoing the Legislature has seen fit to punish. He received (1) a 25-to-life base sentence for the murder, (2) doubled to 50 years to life pursuant to the Three Strikes law because he was a recidivist, plus a 25-to-life sentence enhancement term imposed because (3) he was a gang member who (4) committed a felony with a fellow gang member who was armed with a firearm. The trial court had discretion to reduce defendant's sentence by striking his prior conviction if the circumstances warranted it, and defendant does not challenge the denial of his *Romero* motion. If the court had stricken defendant's prior conviction, defendant would have received a sentence of 50 years to life, the same result he seeks on appeal by eliminating the section 12022.53 enhancement.

14

defendant describes as "strict liability" for murder. Defendant contends the reasoning in *Chiu* and *Chun* should apply in his case.

*Chiu* limits liability for aiders and abettors of premeditated first degree murder, but only those convicted under the natural and probable consequences doctrine of liability. The Supreme Court stated: "An aider and abettor's liability for murder under the natural and probable consequences doctrine operates independently of the felony-murder rule. (*People v. Culuko* (2000) 78 Cal.App.4th 307, 322.) Our holding in this case does not affect or limit an aider and abettor's liability for first degree felony murder under section 189." (*Chiu*, *supra*, 59 Cal.4th at p. 166.) *Chiu* did not hold, nor do we, that the natural and probable consequences doctrine mental state requirements apply in the case of felony murder. An aider and abettor to felony murder does not face the prospect of increased punishment based on the perpetrator's unique mental state.

The *Chun* decision addresses liability under the second-degree felony-murder rule, specifically the "merger" doctrine limiting the underlying felonies that may be used to support a second degree felony murder verdict. As the court explained in *Chun*, "[t]he merger doctrine developed due to the understanding that the underlying felony must be an independent crime and not merely the killing itself." (*Chun*, *supra*, 45 Cal.4th at p. 1189.) Defendant argues that the rationale of the merger doctrine should apply and preclude application of section 12022.53 to aiders and abettors to felony murder, but the concern present in *Chun* is not present here because robbery and burglary are crimes independent of Oropeza's murder. The merger doctrine is also based on the recognition that it is difficult, perhaps impossible, to commit murder without simultaneously committing an assault. (*Ibid.*, citing *People v. Ireland* (1969) 70 Cal.2d 522.) The same cannot be said of the enhancement at issue here because murders can be committed in many different ways that do not involve the use of a firearm. Thus, enhancing a sentence for murder using a firearm need not result in the vast majority of all murderers receiving an enhancement.

F.    *Prosecutorial Misconduct*

Defendant contends the prosecutor told the jury to find defendant committed the charged home invasion robbery because he was a member of a gang that committed home invasion robberies; defendant asserts this was misconduct.  Respondent counters with the assertion that defendant has forfeited this claim and with the contention that the prosecutor's argument was an appropriate explanation of defendant's knowledge of how home invasions were normally committed by the gang and his understanding that Bugarin was in fact planning such a robbery.

1.    *Forfeiture*

In order to preserve a claim of prosecutorial misconduct for appeal, the defendant must object and request a curative admonition in the trial court.  (*People v. Ochoa* (1998) 19 Cal.4th 353, 427; *People v. Avena* (1996) 13 Cal.4th 394, 442.)  "A defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile.  [Citations.]"  (*People v. Hill* (1998) 17 Cal.4th 800, 820.)

Defendant identifies two portions of the prosecutor's closing argument that he claims constitute misconduct.  (See *post*, at pp. 17-18.)  In response to the prosecutor's first statement, defense counsel objected that the prosecutor was "arguing his position." This was not a sufficient objection to permit us to conclude the argument made on appeal was preserved by way of objection in the trial court.  Defendant did not object at all to the second statement made by the prosecutor.  Defendant also claims it would have been futile to request a curative instruction because the standard instructions given by the trial court would not have been sufficient to ameliorate the alleged misconduct.  The trial court, however, could have given a specific curative admonition if warranted, and defendant gives us no reason to think such a specific instruction would have been necessarily ineffective.  Because defendant has failed to show that an objection and/or admonition would have been futile, he has forfeited his claim.

16

## 2. Analysis

Even if defendant had not forfeited his claim of prosecutorial misconduct, the prosecutor's argument, considered in context, was proper.

It is well settled that gang evidence may not be used to show that a defendant has a criminal disposition and so must be guilty of the charged crimes. (See, e.g., *People v. Albarran* (2007) 149 Cal.App.4th 214, 223.) The jury was appropriately instructed that evidence of gang activity could be used only to decide whether "defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crime and enhancements charged" or to show motive.[12]

Defendant claims the prosecutor's closing argument ran contrary to that instruction and to the law limiting the use of propensity evidence. He quotes isolated excerpts of the prosecutor's argument to support his claim, which we have italicized when reproducing the relevant quotations below in their fuller context. In the first excerpt, the prosecutor stated:

> The judge reads you an instruction related to gang evidence. And the judge tells you you could certainly use evidence, gang evidence, to infer what? Of the defendant's intent. That's one of the limitations you have, the defendant's motive. [¶] *And certainly [the gang expert] told you what? That the JBI gang, what's their primary activity? What do they do? Home invasion robberies. This is what they do.* And this is why these individuals are tasked.

---

[12] This rule is based on Evidence Code section 1101 which provides that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Subd. (a).) That section permits the use of "character" evidence to prove "some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ) other than his or her disposition to commit such an act." (Subd. (b).)

The prosecutor went on to develop his argument, which was that JBI had expertise in home invasion robberies and planned and prepared for each one. He used JBI's planning and preparation to show knowledge and intent on defendant's part. The prosecutor argued defendant's statements showed he had an "intimate knowledge of the preparations for this job. This means he was a part of it. He knew what was going to happen." He continued:

> *Again, this is JBI. Their primary activities are to do what? Do home invasion robberies.* And [defendant] starts to inquire about the tools, the resources that are needed to do the home invasion robbery. And what does he say? Can't just be you and me, right? No. It's that guy Pasias, Cron, they are across the street. And [defendant] says well, we can't hop into their car because he knows the victim. . . . So then he's like no, Royal is back there. And what does [defendant] say? All right. Now he's been satisfied, all right. We have the team needed to perform this task.

This was proper argument, particularly given defendant's attempt to portray himself as an uninvolved bystander. The prosecutor was not arguing that defendant committed the residential robbery because he was a JBI gang member; he was arguing that defendant knew that Bugarin was planning a home invasion robbery because such robberies were JBI's primary activity and he accompanied Bugarin with full knowledge of what was to occur, and with the intent to assist it. In addition, and in context, the prosecutor's argument is also reasonably understood as a permissible effort to reinforce the evidence supporting the charged gang enhancement allegation. The prosecutor was required to prove, and argued that he had proven, that defendant was a member of JBI, JBI committed home invasion robberies and defendant participated in the Oropeza robbery for the purpose of assisting JBI, an element of the charged gang enhancement.

18

*G.      Present at the Scene Instruction*

The trial court instructed the jury on aiding and abetting pursuant to CALCRIM No. 401, but did not give a bracketed section of the instruction that states: "If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor." Defendant contends the trial court had a sua sponte duty to give this section of the instruction.

The Bench Notes accompanying CALCRIM No. 401 state that "[i]f there is evidence that the defendant was merely present at the scene or only had knowledge that a crime was being committed, the court has a sua sponte duty to give the bracketed paragraph that begins with 'If you conclude that defendant was present.' (*People v. Boyd* (1990) 222 Cal.App.3d 541, 557[] fn. 14; *In re Michael T.* (1978) 84 Cal.App.3d 907, 911.)"

Defendant contends there was "conflicting evidence" that gave rise to a sua sponte duty to give an instruction containing the bracketed language quoted above, but he does not explain what that evidence was. He asserts the prosecutor emphasized defendant's presence at the scene in discussing his liability as an aider and abettor. At the pages of the transcript cited by defendant, however, the prosecutor stated that although planning for the robbery was done in Pomona, defendant left Pomona and went to Cudahy to take "direct steps towards this robbery occurring." This is not a statement that urged the jury to conclude defendant must have aided and abetted the crime because he was present at the scene of the crime. Even if the prosecutor had emphasized defendant's presence, that would not give rise to a sua sponte duty to instruct. For such a duty to arise, there must be some evidence that defendant was *merely* present at the scene, and we see no such evidence here. Defendant's own account of events showed that at a minimum he participated in planning the robbery and agreed to act as a lookout during the robbery. By his own account, he was assisting in the commission of the crime. Further, defendant's movement toward the garage when Bugarin began struggling with the victim

19

shows that his role was not limited to simply being a lookout. Rather, his role encompassed active involvement in the robbery itself. To be sure, defendant is correct that the prosecutor argued defendant "never tried to prevent this crime from happening." However, this statement was part of the prosecutor's argument that defendant did not withdraw from participating in the crime. The prosecutor did not argue that defendant aided and abetted the crime solely by failing to prevent it. The prosecutor's argument accordingly did not give rise to a sua sponte duty to instruct.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

TURNER, P.J.

KRIEGLER, J.

20