Filed 3/12/21  P. v. Velazquez CA4/1
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D078060 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF1701898) |
| GENESIS RAQUEL VELAZQUEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, John M. Davis, Judge.  Affirmed.

Ronda G. Norris, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

Genesis Velazquez struck and killed a motorcyclist while she was driving under the influence of alcohol and texting.  She had previously been convicted of driving under the influence and was on probation at the time of

the homicide.  A jury convicted her of second degree murder, and the trial court sentenced her to 15 years to life in prison.

In *People v. Watson* (1981) 30 Cal.3d 290, 294 (*Watson*), the California Supreme Court held that, when a defendant commits a homicide while driving under the influence of alcohol, "if the facts surrounding the offense support a finding of 'implied malice,' second degree murder may be charged." Velazquez urges the California Supreme Court to reconsider the *Watson* implied malice murder doctrine—and suggests this court should reconsider it as well.  She also contends the trial court abused its discretion when it denied probation and imposed imprisonment.  We are bound by the Supreme Court's decision in *Watson*, we reject Velazquez's contention the trial court abused its discretion, and we affirm the judgment in full.

FACTS

A. *Charges*

Velazquez was charged with murder (Pen. Code, § 187, subd. (a))[1] and gross vehicular manslaughter while intoxicated (*id.*, § 191.5, subd. (a), Veh. Code, §§ 23152, 23153).

B. *Trial*

1. *Collision with Motorcyclists*

On May 29, 2017, at approximately 9:40 p.m., a witness observed Velazquez driving around 70 miles per hour on the freeway, swerving between lanes.  At 9:44, she unexpectedly moved from the right lane into the middle lane, cutting off another motorist, and continued without braking into the fast lane, where she struck a motorcycle driven by Ava Halsey. Witnesses observed sparks flying from the point of collision across the lanes of the freeway.  One witness observed the motorcycle "spinning off the

---

[1]     Unless otherwise indicated, statutory references are to the Penal Code.

2

ground," and another witness saw something flying above the car in front of her, about eight to 10 feet in the air. A witness called 911 at 9:45 p.m.

Ava's husband testified that he and Ava were riding their motorcycles in the fast lane. He was positioned toward the traffic side of the lane, in front of Ava, who was behind him and positioned toward the median side of the lane.[2] They were driving approximately 80 miles per hour. His motorcycle's engine "died," and he was unable to jumpstart it, so he began to coast toward the left shoulder. As his speed slowed, he saw Ava's motorcycle "go across the freeway." No one was on the motorcycle as it slid by him. He then saw a car coming toward him. As he looked back, he could see a female driver, with her head "down on the steering wheel." He veered to avoid being hit but "ended up getting tapped" and hit the block wall on the left side of the freeway.

Ava's body was in the middle of the freeway. Her husband ran to her and tried to get her to talk to him, but she did not respond. There was blood around her head and body, and she had one eye open and one eye closed. A man approached, identified himself as a firefighter, and started CPR. Paramedics responded and brought Ava to a nearby hospital, but she was pronounced dead due to blunt impact injuries to her head.

California Highway Patrol Officer Richard Becerra arrived at the scene at approximately 9:48 p.m. Ava was lying on her back in the number two lane; vehicles were stopped behind her blocking traffic in all lanes. Velazquez's car was in the center median with damage on the right front side.

---

[2]     Ava's husband testified Ava was wearing "all her [motorcycle] gear," including a helmet, jacket, pants, and boots.

3

## 2. *Driving Under the Influence and Texting While Driving*

Officer Becerra had his first contact with Velazquez about 10 minutes after he arrived on the scene. Velazquez told him that she was on her way home, traveling in the number one lane going 70 to 75 miles per hour. She said she had seen the motorcycles ahead of her, and she was texting her mother that she was on her way home when she struck the motorcycles. She said she "ran him over" and did not know if a male or female was lying in the road. Officer Becerra stood three to four feet from Velazquez during this initial contact and did not notice an odor of alcohol.

Approximately 36 minutes later, Officer Becerra spoke with Velazquez again. She said now she was not sure if she was in the number two lane or the number one lane when the collision occurred. She was confused and "still a little emotional." Her eyes were red and watery, she had been crying, and her speech varied between slow and regular cadence. Standing two to three feet from her, he now detected the odor of an alcoholic beverage on her breath.

Around 10:30 p.m., Officer Becerra conducted field sobriety tests.[3] Her performance on the tests indicated she had been drinking. He administered two preliminary alcohol screening device tests. During the first test at 10:38 p.m., Velazquez had a blood alcohol level of .096 percent. At 10:40 p.m. she had a blood alcohol level of .097 percent. After administering the tests, Officer Becerra placed Velazquez under arrest because he believed she was intoxicated and believed her impairment caused the collision.

---

[3] Video of the administration of the field sobriety tests was shown to the jury. Officer Becerra testified that Velazquez was "cooperative" throughout their interaction.

Officers found two 12-ounce Modelo beer cans on the right front floorboard of Velazquez's car. In the trunk was a three-pack container of 24-ounce Coors Light cans and the empty packaging from a similar container.

After her arrest, blood was drawn four times. The first two draws occurred at 11:27 and 11:28 p.m. and showed a blood alcohol level of .100 percent. The second two draws occurred at 12:06 and 12:07 a.m. and showed a blood alcohol level of .091 percent.

An expert for the prosecution testified that with a blood alcohol level from .01 to .04 percent, some individuals are too mentally impaired to operate a motor vehicle safely. With a blood alcohol level of .05 to .07 percent, most individuals are too mentally impaired to operate a motor vehicle safely. With a blood alcohol level of .08 percent and above, all individuals are too impaired to operate a motor vehicle safely. The expert estimated (based on a "burn-off" or elimination rate of .017 percent per hour) that at the time of the collision, Velazquez's blood alcohol level was .13 percent.

After the last blood draw, Velazquez told Officer Becerra that she had purchased three 16-ounce Modelo beers at a store that evening. She drank one there and one while driving approximately 30 miles to a restaurant for dinner. She drank the third beer at dinner in the restaurant. Video surveillance from the restaurant shows Velazquez seated in the dining area eating and drinking a "tall" can of Coors Light. She opened the beer at the restaurant at about 8:53 p.m. and is last seen drinking the beer at 9:16 p.m. The collision occurred approximately six miles from the restaurant.

There were several outgoing text messages on Velazquez's phone immediately before the collision (which occurred at 9:44 p.m.) (including several at 9:42 and one at 9:44). There was an outgoing phone call at 9:45,

5

immediately after the collision.  The text messages and the phone call were all to the same number.

### 3. *Prior Conviction for Driving Under the Influence*

Velazquez was arrested for driving under the influence of alcohol in 2008 and pled guilty to the offense on September 12, 2011.  She was granted summary probation on the condition that she serve 15 days in custody, not drive with any measurable amount of alcohol in her blood or within six hours of consuming any alcohol or drugs, and that she attend and complete a first offender DUI program and the hospital and morgue mentoring program.

On the change-of-plea form, Velazquez initialed a paragraph which read, "Being under the influence of alcohol, or drugs, or both impairs your ability to safely operate a motor vehicle.  Therefore, it is extremely dangerous to human life to drive while under the influence of alcohol or drugs or both.  If I drive while under the influence of alcohol, or drugs, or both, and as a result of that driving someone is killed, I can be charged with murder."

Velazquez completed the first offender program in 2012.  That program included 32.75 hours of alcohol and drug education and drinking and driving education.  In the classes, they discussed the consequences of drinking and driving, including the meaning of a *Watson* murder charge advisement.

Velazquez completed the hospital and morgue mentoring program in January 2016.  As part of the program, she attended a presentation at the coroner's office where participants were shown cadavers and discussed the consequences of driving under the influence.  Upon completing the program, Velazquez wrote an essay about what she had learned.  She wrote that she was "out," that she had not drunk alcohol "since New Year's," and she wished to completely stop drinking.  She said, "This is another reason for me to completely stop, live, and be that one less out there that [is] making a bad

6

choice for me and everyone around." She wrote that she saw "horrible, traumatic, real life cases" she would never forget, and she was particularly moved by seeing bodies at the coroner's office, including a baby's body. She wrote, "I feel I've been given a last chance at my stupid decisions. The next [time] it won't be pretty." "In conclusion," she wrote, "I got to this program for being stupid reckless, being a careless party animal, stupid, very stupid decisions. I'm lucky I am still alive and haven't killed anyone or myself."

### 4. *Prior Conviction for Public Intoxication*

On March 24, 2016, members of Cal Fire requested assistance from the Riverside County Sheriff's Department because they were attempting to render aid to an individual who was combative. When deputies arrived, they found Velazquez standing on the roadside, swaying back and forth and dropping items she was trying to carry. Deputies smelled the odor of alcoholic beverage emitting from her person. She was irate, argumentative, and shouting. Deputies determined she was so intoxicated she could not provide for her own safety and arrested her. She subsequently pled guilty to public intoxication in violation of section 647, subdivision (f).

### 5. *Defense Case*

An expert for the defense opined that, at the time of the collision, Velazquez's blood alcohol level was only around .04 to .06 percent, based on his opinion that there was not enough time for full absorption between her drinking at the restaurant and the time of the collision. He believed her blood alcohol level did not peak until after the collision, around the time she took the preliminary alcohol screening and blood tests. The defense expert criticized the prosecution's retrograde extrapolation of Velazquez's blood alcohol level because it assumed full alcohol absorption at the time of driving.

### 6. *Jury Instruction as to Implied Malice Murder*

The jury was instructed that for the crime of murder (§ 187), the prosecutor was required to prove that the defendant committed an act that caused the death of another, and when defendant acted, "she had a state of mind called malice aforethought." The jury was instructed there are two kinds of malice aforethought, express and implied. A defendant acted with express malice if she unlawfully intended to kill. A defendant acted with implied malice if (1) she intentionally committed an act, (2) the natural and probable consequences of the act were dangerous to human life, (3) at the time she acted she knew her act was dangerous to human life, and (4) she deliberately acted with conscious disregard for human life.

### 7. *Verdict*

The jury convicted Velazquez of second degree murder (§ 187, subd. (a); count 1) and gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a); count 2).

### C. S*entencing*

The trial court denied probation and sentenced Velazquez to an indeterminate term of 15 years to life in prison for murder. The court imposed and stayed an additional 10-year sentence for gross vehicular manslaughter while intoxicated. (§ 654.)

DISCUSSION

I.

*Implied Malice Murder Conviction*

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Malice aforethought may be express or implied. (§ 188, subd. (a).) "Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are

8

dangerous to human life, performed with conscious disregard for that danger." (*People v. Elmore* (2014) 59 Cal.4th 121, 133, see § 188, subd. (a)(2).)

Malice may be implied when a person willfully drives under the influence of alcohol. (*Watson, supra*, 30 Cal.3d at p. 294.) In *Watson*, after drinking at a bar, the defendant drove with a blood alcohol level of .23 percent. The defendant struck another vehicle while driving approximately 70 miles per hour, killing its driver and a passenger. (*Id*. at pp. 293-294.) The prosecution charged the defendant with two counts of second degree murder. (*Id*. at p. 294.) Prior to trial, the trial court granted defendant's motion to dismiss the murder counts (§ 995), and the People appealed (§ 1238, subd. (a)(1)). (*Watson*, at p. 294.) On appeal, the defendant argued that in homicide cases involving vehicles, the prosecution can only charge a person with vehicular manslaughter and not murder. (*Id*. at p. 294.) The Supreme Court disagreed and held "if the facts surrounding the offense support a finding of 'implied malice,' second degree murder may be charged[.]" (*Ibid*.; see § 192, subd. (e) [statute subsequently amended to provide that " '[g]ross negligence,' as used in this section, does not prohibit or preclude a charge of murder under Section 188 upon facts exhibiting wantonness and a conscious disregard for life to support a finding of implied malice, or upon facts showing malice, consistent with the holding of the California Supreme Court in [*Watson, supra*,] 30 Cal.3d 290"].) To support a conviction of second degree murder based on implied malice, the prosecution must prove the defendant was subjectively aware of the risk of death created by driving while intoxicated. (*Watson*, at pp. 296-297.)

Since *Watson*, numerous appellate courts have upheld murder convictions in cases where defendants have committed homicides while driving under the influence of alcohol. (*People v. Wolfe* (2018) 20 Cal.App.5th

9

673, 682 (*Wolfe*) [affirming *Watson* implied malice murder conviction and listing cases].)  "Generally, these opinions 'have relied on some or all of the following factors' that were present in *Watson*:  '(1) blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving.' [Citation.]  However, 'nowhere does the opinion in *Watson* state that all of the factors present in that case are necessary to a finding of second degree murder.' " (*Id.* at pp. 682-683.)

Velazquez contends "[i]t is time to reconsider the *Watson* murder doctrine and the legal fictions on which it rests."  But, as Velazquez acknowledges, *Watson* is binding law which this court is required to follow. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Velazquez offers no other cogent argument for reversing her conviction. To the extent she challenges the evidence supporting her conviction, we conclude there is ample support for her implied malice murder conviction. Velazquez was previously convicted for driving under the influence, and in her plea agreement she acknowledged the dangers of driving while intoxicated and the possibility she may be charged for murder should her impaired driving cause a homicide.  She completed the first offender program, where she discussed the consequences of drinking and driving, including the meaning of a *Watson* murder charge advisement.  She completed the hospital and morgue mentoring program, where she discussed the consequences of driving under the influence and visited a coroner's office, and afterward acknowledged in writing that her impaired driving was "stupid reckless" and she was "lucky [to be] alive and [to] have [not] killed anyone or [her]self." She purchased alcohol at a store, drank there, then proceeded to a restaurant where she consumed more alcohol; she also drank while actually driving.  She

10

admitted to drinking several beers before getting on the freeway to drive home, and expert testimony established that her blood alcohol level exceeded the legal limit. In addition, she dangerously cut off other motorists and texted while driving under the influence, causing her to strike and kill a motorcyclist. She was also on probation at the time of the instant offense. The totality of the evidence supports the jury's finding of implied malice and supports Velazquez's conviction for second degree murder. (*Watson, supra,* 30 Cal.3d at p. 294; *Wolfe, supra,* 20 Cal.App.5th at pp. 682-683.)

## II.

### *Sentencing*

Velazquez contends the trial court abused its discretion when it imposed a prison term rather than granting her probation. We disagree.

A. *Additional Factual Background*

A probation officer's report was prepared in anticipation of sentencing. The probation officer indicated that Velazquez was eligible for probation and listed factors relating to the crime that supported a grant of probation, including that the defendant was not armed with a weapon when committing the crime, and the manner in which the crime was carried out did not demonstrate criminal sophistication. (Cal. Rules of Court, rule 4.414(a)(2), (8).) Additional factors relating to the defendant that supported a grant of probation included that the defendant was willing and able to comply with reasonable conditions of probation, the likely effect of imprisonment was considered to be serious, the adverse collateral consequences on defendant's life resulting from the felony conviction could be serious, and the defendant stated she was remorseful. (*Id.*, rule 4.414(b)(3)-(7).) The probation officer also listed factors relating to the crime that supported the denial of probation, including that the nature and circumstances of the crime are

11

serious compared to other instances of the same crime, the victim was vulnerable, the defendant inflicted physical or emotional injury, and the defendant was an active participant in the commission of the crime. (*Id.*, rule 4.414(a)(1), (3)-(4), & (6).) Finally, the probation officer listed factors relating to the defendant that supported the denial of probation including the defendant's prior record of criminal conduct indicated a pattern of regular or increasingly serious criminal conduct, defendant's prior performance on probation was not satisfactory, the defendant was presently on probation, and it was likely that if released, the defendant would be a danger to others. (*Id.*, rule 4.414(b)(1)-(2), (8).)

Using the Correctional Offender Management Profiling for Alternative Sanctions risk and needs assessment, the probation officer determined Velazquez's violent recidivism risk to be medium and general recidivism risk to be low.

The probation officer reported that Velazquez stated she "does not believe she needs additional drug treatment but would like mental health treatment in order to talk to a counselor about her past." She told the officer, " 'Relapsing, that's not even a question. It's not going to happen.' " The probation officer opined that Velazquez made statements contradicting a true desire for rehabilitation, as she initially stated she believed she did not need any additional substance abuse treatment, but she also indicated she wanted to participate in the Delancey Street Foundation program and saw the benefits of rehabilitation and having a plan to reintegrate into the community.[4] The probation officer acknowledged that Velazquez previously

---

[4] The Delancey Street Foundation is a residential educational organization for former alcoholics, drug addicts, and convicts and requires a two-year commitment.

had the chance at rehabilitation in the community through her prior grant of summary probation and was on probation when the offense occurred. The probation officer recommended that Velazquez be denied probation and that the court sentence her to 15 years to life in prison.

At sentencing, Velazquez addressed the trial court, stating that she was "sorry and very remorseful" and asking for forgiveness. Ava's husband addressed the court and said that, as his wife was dying in his arms, Velazquez showed no remorse, and stated she "[c]ould have at least tried to call 911." Velazquez's counsel argued circumstances justified a grant of probation and provided a letter confirming Velazquez's tentative acceptance into the Delancey Street Foundation. The People argued that, although Velazquez was not ineligible for probation, she was not suitable for probation because she was on probation at the time of the offense, she was given an opportunity to change her behavior after her prior conviction, and yet she thereafter committed a new violation involving alcohol (§ 647, subd. (f)) and then struck and killed a motorcyclist while driving under the influence.

The trial court stated:

> "And so the jury heard the case. And they found her guilty of second degree murder. . . . The defendant had, as Counsel stated, many prior contacts, convictions, and so forth that leads the [c]ourt to award a finding that probation would be inappropriate. She was . . . also texting while this happened. She was under the influence. She did not do very well on the [field sobriety tests] that were administered at the scene. She was argumentative and uncooperative.

> " . . . [A]ll those count against her. She was informed previously on at least one occasion, but probably more than one occasion, that if she drank and drove and killed somebody that she could be facing murder, which unfortunately has happened. And that was in 2011. And our case occurred in 2017.

13

"And then I also think—I'm not sure how much weight to give this, but according to the probation officer's report, . . . the defendant does not believe that she needs additional drug treatment, but would like mental health treatment in order to talk to a counselor about her past. She said relapsing, that's not even a question. It's not going to happen. The defendant believes she may have PTSD and so forth, and wants to engage in counseling about her prior life.

"I also acknowledge that she states that if she was granted probation, she would go along with all the terms of that probation. That's her statement.

"[¶] . . . [¶]

"The fact of the defendant being remorseful is important to the court in that at the time there was no showing that she was remorseful. She may be later, may be now. And so that weighs on the [c]ourt's decision. The risk and needs assessment report showed two things, that the defendant's violent recidivism risk was determined to be medium. [¶] And additionally, the defendant's general recidivism risk was determined to be low. And I did consider that.

"And the aggravating factors just outweigh the mitigating factors by a great amount. The mitigating factors are just way below the level in my view of the aggravating factors and so on. It's just so tragic but so made more awful by the fact that she had a DUI. She was also on probation for—at the time this happened for I believe an alcohol-related offense.

"[¶] . . . [¶]

". . . I understand that . . . the defendant, even though she's only had misdemeanor offenses in the past, going to prison would have—may have serious effects on her, but the serious nature of this case outweighs that. And the defendant already had chances at rehabilitation in the community when we gave her summary probation before."

14

As previously indicated, the trial court imposed a sentence of 15 years to life in prison on count 1 (§ 190, subd. (a)) and imposed but stayed the upper term of 10 years on count 2 (§§ 191.5, subd. (c), 654).

B. *Analysis*

We review a sentencing decision for abuse of discretion. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847; see *People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977-978.) " 'The burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.' [Citation.] Concomitantly, '[a] decision will not be reversed merely because reasonable people might disagree. "An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge." ' " (*Alvarez*, at pp. 977-978.)

As previously noted, the probation report detailed numerous mitigating factors and numerous aggravating factors. The trial court expressly acknowledged it had the discretion to grant probation, but after carefully weighing the factors, determined the factors in aggravation outweighed the mitigating factors "by a great amount." The trial court emphasized that Velazquez had multiple prior alcohol-related convictions, she was warned that drinking and driving could lead to a murder charge against her, and she was on probation at the time of the crime.

Velazquez contends the circumstances supporting a grant of probation "far outweighed" the circumstances against it, and the trial court therefore erred when it denied probation. Velazquez disagrees with the finding that the motorcyclist was an especially vulnerable victim, but she also

15

acknowledges that motorcyclists on the freeway lack the protections generally afforded to other drivers (who are typically enclosed in vehicles equipped with restraints and air bags). She contends the motorcyclists "abruptly slowed down in the fast lane," contributing to the accident. However, as motorcyclists traveling together and experiencing unexpected engine trouble, the victim (and her husband) were in a vulnerable position and reliant on other drivers to exercise due caution. Rather than exercising caution, Velazquez engaged in dangerous driving—veering across lanes, cutting off motorists, and texting—all while intoxicated. She has not shown that the victim's vulnerability was an improper factor for the trial court to consider under the circumstances of this case. Velazquez further contends her blood alcohol level was "barely over the legal limit." But the prosecution's expert opined that, at the time of the collision, Velazquez's blood alcohol level was .13 percent, far higher than the legal limit of .08 percent. (Veh. Code, § 23152, subd. (b).) Velazquez willfully ingested alcohol knowing she would be driving—indeed, she drank at the store where she purchased some of the alcohol, at a restaurant, and even *while driving*. Her judgment and physical ability to drive were impaired, she exacerbated the risks by texting while driving under the influence, and she exhibited a conscious disregard of the danger she posed to others. (See *Watson*, *supra*, 30 Cal.3d at pp. 300-301.).

While minimizing these aggravating factors, Velazquez focuses on circumstances in mitigation, including that Velazquez was employed at the time of the crime, that she was a single mother responsible for her child, that she had the support of her mother, and that she was offered conditional acceptance into the Delancey Street Foundation program. Velazquez has not met her burden to show the court's sentencing decision was irrational or arbitrary. We reject Velazquez's claim that the trial court "failed to consider

16

many factors in mitigation." It is clear from the record that the trial court read and considered the probation report (which discussed aggravating and mitigating factors), considered the parties' competing sentencing memoranda, heard argument of counsel, heard testimony from several of the victim's family members and witnesses in favor of Velazquez, and heard from Velazquez herself; it clearly considered relevant sentencing criteria under California Rules of Court, rule 4.414 before exercising its discretion to deny probation. Moreover, "[t]he trial court's mere failure to mention expressly all evidence presented in mitigation . . . does not mean the trial court ignored or overlooked such evidence, but simply indicates that the court did not consider such evidence to have appreciable mitigating weight." (*People v. Samayoa* (1997) 15 Cal.4th 795, 860; see *People v. Abilez* (2007) 41 Cal.4th 472, 530 [the fact that the trial court "did not find defendant's proffered mitigating evidence as persuasive as he would have liked does not undermine" the conclusion that the court weighed the aggravating and mitigating evidence]; *People v. Tully* (2012) 54 Cal.4th 952, 1064 [absent indication trial court ignored or overlooked evidence on sentencing, reviewing court will not find error].) The record indicates the trial court was aware of its discretionary authority, it carefully weighed all relevant factors, and it exercised its discretion to impose a prison sentence rather than granting probation. (*People v. Kelley* (1997) 52 Cal.App.4th 568, 582 ["The court is presumed to have considered all relevant factors unless the record affirmatively shows the contrary."].) As the reviewing court, we do not substitute our judgment for the trial court's. (*Alvarez, supra,* 14 Cal.4th at p. 978; *People v. Jordan* (1986) 42 Cal.3d 308, 317 ["The Court of Appeal . . . erred when it reweighed the circumstances in mitigation rather than limiting its review to whether the sentencing court abused its statutory discretion."].)

Velazquez also challenges some of the trial court's findings at sentencing—asserting that the court relied on "completely incorrect facts" or facts that were not "supported by the record." More specifically, Velazquez contends the trial court improperly found that she was "argumentative and uncooperative" at the scene, that, "at the time [of the incident,] there was no showing that she was remorseful," and that she had "many prior contacts, convictions, and so forth." Velazquez's counsel did not object to these findings at the sentencing hearing. Generally, "complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal." (*People v. Scott* (1994) 9 Cal.4th 331, 356 (*Scott*).) "Such errors are essentially factual" and are "forfeited if not raised at the sentencing hearing." (*People v. Trujillo* (2015) 60 Cal.4th 850, 856-857.) Because Velazquez's counsel did not object at the sentencing hearing, she has forfeited these contentions.

Even if the issue were properly before us, we would reject it. "A trial court abuses its discretion when the factual findings critical to its decision find no support in the evidence." (*People v. Cluff* (2001) 87 Cal.App.4th 991, 998 (*Cluff*).) "When th[e trial] court errs in identifying or articulating its sentencing choices, the reviewing court has no choice but to remand the matter for resentencing unless it finds the error nonprejudicial, i.e., it is 'not reasonably probable that a more favorable sentence would have been imposed in the absence of the error.'" (*Scott, supra*, 9 Cal.4th at p. 355.)

The record indicates Velazquez had at least two prior misdemeanor convictions involving alcohol, which supports the trial court's finding regarding prior convictions. Moreover, Velazquez did not call 911 or otherwise attempt to render aid to the victim or the victim's husband at the

18

scene.[5] These facts support the trial court's findings regarding lack of remorse at the time of the crime.

In contrast, the trial court's finding that Velazquez was "argumentative and uncooperative" is contradicted by evidence offered by Officer Becerra that Velazquez was "cooperative" at the scene.[6] However, even if the court's finding regarding Velazquez's behavior at the scene was erroneous, we conclude any error was not prejudicial. (*Scott, supra*, 9 Cal.4th at p. 355.) Despite the court's statement that Velazquez was "argumentative and uncooperative" at the scene of the crime, it is clear this fact was not "critical to its decision." (*Cluff, supra*, 87 Cal.App.4th at p. 998.) Rather, the court emphasized that the factors it found material were Velazquez's prior alcohol-related misdemeanor convictions—in particular her prior DUI—and the fact that she was on probation for her prior offense when this crime occurred. Thus, it is " 'not reasonably probable that a more favorable sentence would have been imposed' " if the trial court had acknowledged Velazquez was cooperative with police at the crime scene. (*Scott*, at p. 355.)

---

[5] The trial court also had the opportunity to watch and listen to Velazquez's statements at sentencing. The court concluded that, at the time of the crime, "there was no showing that she was remorseful. She may be later, may be now."

[6] Because Velazquez failed to object to the trial court's finding at the time of sentencing, the trial court was not afforded an opportunity to explain the basis for its finding regarding Velazquez's behavior. Velazquez's behavior at the time of her *prior* arrest for public intoxication was described by a witness as "irate" and "argumentative."

## DISPOSITION

The judgment is affirmed.


GUERRERO, J.

WE CONCUR:


McCONNELL, P. J.


BENKE, J.